710 A.2d 545 (1998)
311 N.J.Super. 437
STATE of New Jersey, Plaintiff-Respondent,
v.
Luis CANDELARIA, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted January 27, 1998.
Decided April 20, 1998.
*546 Ivelisse Torres, Public Defender, for defendant-appellant (Kevin G. Byrnes, Designated Counsel, of counsel and on the brief).
Luis Candelaria, appellant, filed a pro se brief.
Maryann K. Bielamowicz, Mercer County Prosecutor, for plaintiff-respondent (Skylar Weissman, Assistant Prosecutor, of counsel and on the brief).
Before Judges LONG and STERN.
The opinion of the court was delivered by STERN, J.A.D.
Defendant appeals from twenty convictions relating to a series of armed robberies and burglaries occurring in Trenton in November and December 1993, and from his sentence of life plus 105 years with sixty years of parole ineligibility. We affirm the convictions but modify the sentence.

I.
Defendant was indicted for armed robbery, N.J.S.A. 2C:15-1 (counts three, four, five, seven, eight, ten, eleven, fourteen, fifteen, seventeen, nineteen and twenty); burglary while armed, N.J.S.A. 2C:18-2a(1) and -2b(2) (counts two, six, nine, thirteen, sixteen and eighteen); theft by receiving stolen property, N.J.S.A. 2C:20-7a (count one); burglary, N.J.S.A. 2C:18-2a(1) (count twelve), and possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4a (count twenty-one). After the denial of his motion to suppress and a pretrial hearing at which the trial judge concluded that his statements were admissible, defendant was convicted of all charges except for the theft alleged in count one.[1]
The State's motion for an extended term pursuant to N.J.S.A. 2C:44-3 was granted, and defendant was sentenced on count three to a term of life imprisonment in the custody of the Commissioner of the Department of Corrections with twenty-five years to be served before parole eligibility. He was given twenty year sentences with minimum parole ineligibility terms of seven years each, consecutive to count three, on counts seven, ten, fourteen, seventeen, nineteen, and to a five year term on count twelve consecutive to count three. Count twenty-one was merged into count three. Sentences on the other convictions were made concurrent to count three. The sentencing judge stated, and the parties agree, that defendant received an aggregate sentence of life imprisonment plus 105 years with sixty years of parole ineligibility.[2]See also N.J.S.A. 2C:44-5e regarding *547 aggregation. Additionally, a $350 aggregate Violent Crimes Compensation Board penalty was imposed and $1,178 in restitution was ordered.
Defendant appeals to us and, in a brief prepared by designated counsel, he argues:
POINT I THE DEFENDANT'S RIGHT TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES WAS AS GUARANTEED BY THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. 1 PAR. 7 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED:
THE SEARCH OF THE DEFENDANT WAS UNLAWFUL BECAUSE A REASONABLE POLICE OFFICER WOULD NOT HAVE CONCLUDED THAT THERE WAS JUSTIFIABLE SUSPICION TO BELIEVE THAT THE DEFENDANT WAS ARMED AND DANGEROUS.
POINT II THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. I PAR. 1 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED BY THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY ON THE LAW OF ORAL INCULPATORY ADMISSIONS. (Not Raised Below)
POINT III THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. 1 PAR. 1 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED:
A. THE TRIAL COURT IMPROPERLY ADMITTED OTHER-CRIME EVIDENCE. (Not Raised Below)
B. THE TRIAL COURT ERRED BY FAILING TO GIVE THE JURY A LIMITING INSTRUCTION ON THE PERMISSIBLE AND IMPERMISSIBLE USE OF THE OTHER-CRIME EVIDENCE. (Not Raised Below)
POINT IV THE DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ART. 1 PAR.1 OF THE NEW JERSEY CONSTITUTION WAS VIOLATED BY THE ADMISSION OF AN EXPERT OPINION BY A POLICE OFFICER WITHOUT QUALIFYING HIM AS AN EXPERT AND WITHOUT ESTABLISHING THAT THE SCIENCE, METHODOLOGY OR TECHNIQUE USED BY HIM YIELDS SUFFICIENTLY RELIABLE RESULTS. (Not Raised Below).
POINT V THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT THAT THE DEFENDANT KNOWINGLY AND VOLUNTARILY WAIVED HIS MIRANDA RIGHTS.
POINT VI THE DEFENDANT'S SENTENCE IS EXCESSIVE:
A. THE TRIAL COURT ERRED BY IMPOSING AN EXTENDED TERM WITH A PAROLE INELIGIBILITY.
In a pro se supplemental brief defendant also argues:
POINT I THE CONVICTION MUST BE REVERSED BECAUSE THE EVIDENCE WAS OBTAINED BY THE EXPLOITATION OF AN ILLEGAL ARREST IN VIOLATION OF U.S. CONST. AMEND. IV AND ART. 1 ¶ 7 OF THE N.J.CONST. (1947)
POINT II DEFENDANT'S CONVICTION MUST BE REVERSED DUE TO INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF U.S. CONST. AMENDS. VI AND XIV AND ART.1, ¶ 9 OF THE N.J.CONST. (1947)
*548 POINT III DEFENDANT WAS DENIED THE RIGHT TO A SPEEDY TRIAL IN VIOLATION OF THE SIXTH AMENDMENT OF THE CONSTITUTION OF THE UNITED STATES AND ARTICLE 1, PARAGRAPH 10 OF THE CONSTITUTION OF THE STATE OF NEW JERSEY
Our careful review of the record convinces us that these contentions, except as they relate to defendant's sentence, are without merit and that only the following discussion is warranted. R. 2:11-3(e)(2).

II.
The State's case was strong, and defendant does not argue to the contrary.
On December 26, 1993, defendant broke into the home of Angela Maloney and her mother, Angela Maiorino. At around 3:00 a.m. that morning, Ms. Maloney was awakened by the sound of her "burglar alarm" and the screams of her mother. A man with a gun, who Ms. Maloney "definitely" believed was "the same person" who had robbed her previously, entered her bedroom, pointed the gun at her, "pulled" her out of bed and took her down the steps at gunpoint to turn off the alarm.
Ms. Maloney told the intruder that she did not "have any money" because it was Christmas and she had given all her money "to the kids." Nonetheless, Ms. Maloney gave the man what money she had in her purse and defendant took "a large bag of coins" in "a plastic Ziploc bag" and coins she had in two other bags, together with some items remaining in her jewelry box which had not been previously taken.
Lieutenant Michael Salvatore of the Trenton Police Department was supervisor of the "major crimes squad" who "put together a task force" to investigate a series of robberies committed within a one month period which basically "mirrored each other" and were "almost identical." On December 27, 1993, Salvatore reviewed the report regarding the Maloney robbery and noticed that the thief took a plastic bag containing approximately $40 in coins. Salvatore "instructed [his] detectives to focus their attention" on stores in the Columbus Park area where "an individual may take this large amount of coins and cash it in" for currency. He directed the officers to provide the store proprietors with a phone number to call "if anyone came in with a large amount of change."
That day, the detectives received a phone call from the proprietor of an AM-PM Mini-Market who they had contacted earlier. At approximately 3:00 o'clock that afternoon, Detective Salvatore and Detective Carmen Salvatore (hereinafter "Detective Carmen") proceeded to the store. They learned from the clerk that a "Hispanic male wearing a light-color jacket" was in earlier and had asked the clerk if he would exchange "a large amount of coins" for currency. Pursuant to the detective's earlier instructions, the clerk told the man that he would be willing to make such an exchange. According to the clerk, the man then left but said he would return with the coins.[3]
While they waited for the man to return, Detective Carmen "remain[ed] inside of the store" and Detective Salvatore waited in his unmarked police car parked "out front." As he was exiting the store, the detective observed defendant, "a Spanish young male," wearing a tan jacket and dark gloves with polka dot glove liners similar to items which two of the victims had reported the perpetrator had worn. The man was also carrying a plastic bag and appeared to be "straining" as though it contained "something heavy." As defendant came through the door, Detective Salvatore "purposely bumped into him" and determined that there was "a hard object inside" the bag. The detective believed that this was the same man the clerk had informed them about. He returned to his police vehicle and radioed other detective units in the area instructing them to converge on the mini-market.
The detective then went back into the store, "approached the defendant," and *549 "identified himself." He advised defendant that he was investigating several robberies committed in the area, and asked him to come outside with him. Once outside the store, the detective questioned defendant who denied involvement in the robberies and identified himself, in English, as Luis Candelaria. He also provided the detective with his address609 Greenwood Avenue in Trenton.
Aware that a handgun was used in the robberies under investigation, Detective Salvatore conducted a Terry frisk[4] of the defendant. In his recitation of the stipulated facts, the judge noted that "Detective Salvatore [was] aware that the perpetrator of the crimes he was investigating repetitively used a handgun ... and he, the detective, justifies this frisk on the basis that he feared for his safety at the time." In the course of the frisk, the detective further observed that the defendant was wearing a man's Pulsar watch and a gold box-link chain ring, both of which matched descriptions of jewelry reported stolen by two of the victims. At that point, the detective believed that the defendant was the individual responsible for committing the robberies. Consequently, he arrested the defendant and advised him of his Miranda rights.
While defendant was being transported to police headquarters in another vehicle, Detective Salvatore and Detective Carmen went to the address given to them by defendant. At that address the detectives met Bertha Rogers, the defendant's girlfriend. The detectives advised Ms. Rogers of their investigation and that the defendant was in police custody. During the conversation, Detective Salvatore observed that Ms. Rogers was wearing a pair of earrings and a crucifix matching the description of items that two of the victims had reported as stolen. Ms. Rogers stated that the jewelry were "gifts" from the defendant, and then showed the detectives other jewelry and coins which they also "believed to have been taken from recent robberies."
Ms. Rogers informed the detectives that she "possessed the apartment alone and paid the rent." The defendant, she stated, "was her boyfriend" and only "a guest." The detectives asked her if she would consent to a search of the premises. They advised her that she had "the right to refuse to consent," and she agreed to allow them to conduct a search. They presented her with a voluntary consent to search form which she read and signed.
A pellet gun and a gray ski cap with two eye holes cut in it were discovered underneath a bed. The gun matched descriptions of the weapon used in the robberies. Additionally, several pieces of jewelry were also discovered which matched descriptions provided by victims. During the course of the search, Ms. Rogers also informed the detectives that the defendant had recently given his grandfather a ring. Another detective was dispatched to the grandfather's residence where the grandfather voluntarily turned the ring over.
Upon his return to Trenton police headquarters, Detective Salvatore was advised by Detective Edgar Rios that Rios had read defendant his Miranda rights and had given defendant a Spanish Miranda rights form which had been completed and signed by the defendant.[5] Nevertheless, Salvatore himself asked defendant if he had been advised of his rights, and defendant acknowledged that he had. Defendant was also asked by Salvatore if the signature on the Spanish Miranda form was his, and defendant indicated that it was. He was further asked if he understood the contents of the form and defendant stated that he did. Detective Salvatore then again advised defendant, in English, of his Miranda rights.
The detective told defendant that they had recovered the jewelry from Ms. Roger's apartment and that she was cooperating and at headquarters. Defendant "sighed, looked down at the floor, indicated to [the detectives] *550 that he didn't mean to rob those people, that he had a drug problem and he needed help." He agreed to give a formal written statement which was taken by Detective Carmen and witnessed by Detectives Rios and Salvatore.
After defendant's statement was completed, he indicated that he could not read English "well" so Detective Rios read the statement back to defendant in Spanish. The detective read each question and answer and asked defendant if each was correct. Defendant initialed each page after Detective Rios finished reading it back and signed his complete name on the final page.
The next morning, defendant was brought back to the interview room, again advised of his rights in Spanish, and, after signing another Miranda form, continued with his formal statement. Detective Carmen continued to question defendant in English and defendant responded in English. Then each question and answer was read back to defendant in Spanish by Officer Arlene Robles, and defendant acknowledged that each was "accurate and correct." As each page was finished, the defendant initialed it and when the entire statement had been read back, defendant signed the last page.
In addition to Detectives Salvatore, Carmen, Rios, and Officer Rosario, defendant testified at the Miranda hearing. He asserted that he was not advised of his rights when he was arrested nor when he was interviewed at headquarters, and that he signed the statement only because he was "scared... and ... signed any paper that they brought." He also claimed that he signed the statement because he was told that it was a receipt for the items "found in [his] house" and that if he did, he "could save the lady." He further testified that he had purchased the bag of coins for $35 and that he requested an attorney but was told by Detective Carmen that he did not "need one." He also maintained that Detective Salvatore looked "like he was angry and he was going to hit" him.
The trial court rejected defendant's version as "simply incredible." The judge found that Miranda rights were properly administered, that defendant "understood those rights," and that he elected to waive them.[6] The court concluded that the State met its burden beyond a reasonable doubt in demonstrating compliance with Miranda and that defendant's statements were admissible.
Investigating and arresting detectives, Ms. Rogers and most of the victims testified for the State at trial.[7] The State's evidence at trial included testimony by victims who described the perpetrator's clothing similar to that worn by defendant at the time of arrest and found in his apartment, together with the stolen property identified by the victims and Ms. Rogers. Defendant's statement of the morning of December 28 was also introduced into evidence together with the testimony concerning the way it was obtained. The defense presented no witnesses. As noted, defendant was convicted on twenty of the original twenty-one counts. We conclude that on the record made there was no "plain" or harmful error given the strength of the State's case. R. 2:10-2.

III.
Defendant contends that the frisk of his person by Detective Salvatore constituted an unlawful search.[8] He insists that there *551 was no basis for concluding that the detective possessed the requisite "reasonable and articulable" suspicion that defendant was armed and dangerous at the time of the encounter. Thus, he contends that the evidence obtained during the pat-down search and everything derived therefrom should have been suppressed. We disagree.
The record contains sufficient evidence of objective criteria to support the determination that Salvatore had a specific and objectively reasonable basis for believing that the suspect was armed and dangerous. See State v. Thomas, 110 N.J. 673, 677-80, 542 A.2d 912 (1988). Detective Salvatore stopped defendant because his physical characteristics and clothing matched the description of the person responsible for committing several armed robberies, and the detective knew both that a large quantity of coins had been stolen by this person the night before, and that a person matching defendant's description was en route to the mini-market to exchange a large quantity of coins for currency. Based on these facts, the detective reasonably suspected that defendant was the armed robber and that he might well be armed and dangerous.

IV.
There was also sufficient credible evidence to support the trial judge's conclusion that defendant's statement was given after a knowing, voluntary waiver of his Miranda rights and that his statement was admissible. State v. Johnson, 42 N.J. 146, 161-62, 199 A.2d 809 (1964).
Defendant nevertheless asserts that his conviction must be reversed because the jury was not instructed that it had to find that defendant's inculpatory statements were credible. Defendant further contends that the judge improperly failed to instruct the jury that oral statements must be carefully scrutinized because they may be the product of miscommunication. See State v. Hampton, 61 N.J. 250, 263-64, 294 A.2d 23 (1972); State v. Kociolek, 23 N.J. 400, 129 A.2d 417 (1957); N.J.R.E. 104(c). We find no plain error warranting reversal. See State v. Jordan, 147 N.J. 409, 417-22, 425-28, 688 A.2d 97 (1997). See also State v. Chew, 150 N.J. 30, 81-83, 695 A.2d 1301 (1997).
There was substantial evidence clearly establishing defendant's guilt in addition to his statements. Various articles of clothing and a gun were recovered from the apartment where defendant claimed to live with his girlfriend. They were identified by several victims as the clothes and gun used by the man who robbed them. Further, stolen jewelry was discovered in the apartment, including items worn by defendant's girlfriend, who testified that she received them from defendant. The detective further testified how, after the recovered jewelry was brought back to police headquarters, the victims identified their property.[9] Moreover, following opening statements, the trial judge advised the jury:
Both counsel have mentioned [the] statement or statements allegedly made by the defendant. With regard to that, let me simply tell you at this point in time, it is going to be your function to determine whether or not such statement or statements were actually made by the defendant, and if made, whether or not the statements or any portion of the statements are, in fact, credible. And you're going to have to consider the facts and circumstances certainly surrounding the giving of the alleged statements in order to do this, and I'll instruct you more fully about that at the conclusion of the case.
And in his final charge to the jury, the judge instructed the jurors as to their function in deciding credibility and to consider the credibility of all testimony, which necessarily included the testimony regarding defendant's statements. As in State v. Jordan, supra, 147 N.J. 409, 688 A.2d 97, the omission of portions of the charge in defendant's case could not have affected the result.
*552 Similarly, we see no basis for reversing defendant's convictions because the jury learned he had previously used illegal drugs and perpetrated drug offenses. There was testimony by victim Margaret Krest that defendant said "I don't want to shoot anybody, I just want money," and when asked by her "why do you want this money?", he responded "I need drugs." The evidence, offered as part of the res gestae, expressed what defendant told a victim at the time. Cf. State v. Marrero, 148 N.J. 469, 483-86, 691 A.2d 293 (1997) (evidence of defendant's plea of guilty to sexual assault of different victim admissible because it was offered by the State to show defendant's intent, motive and degree of culpability in murder prosecution). Moreover, inclusion of reference to drug use in his statement was part of his explanation as to why he would not hurt a victim and his motive for the robberies. In any event, there was no objection to this evidence or to the absence of any limiting instruction (even assuming it to be "other crimes evidence"). Given the other evidence in the case, this testimony was not "clearly capable of producing an unjust result," R. 2:10-2, and we find no "plain" or reversible error.

V.
Defendant claims, in his pro se supplemental brief, that he was deprived of a speedy trial. However, we can find no evidence in the record that he moved for a speedy trial or for dismissal of the indictment on speedy trial grounds. There is simply no record before us to allow review of the relevant factors with respect to such a claim. See, e.g., Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L. Ed.2d 101 (1972).

VI.
Defendant contends that his sentence of life imprisonment plus 105 years with sixty years to be served before parole eligibility is a "patently excessive" sentence. He asserts that the problem is attributable to the trial court's unjustifiable imposition of an extended term and six consecutive terms.
In imposing a discretionary extended term under N.J.S.A. 2C:44-3a, the sentencing court must 1) consider whether the minimum statutory predicates for extended term eligibility are met; 2) determine whether to impose an extended term; 3) weigh the aggravating and mitigating factors to determine the base term of the extended term; and 4) decide whether to impose a period of parole ineligibility. State v. Dunbar, 108 N.J. 80, 89, 527 A.2d 1346 (1987).
There is no contest that the statutory predicates to an extended term were satisfied in this case. Defendant was convicted within ten years of these crimes for burglary, criminal attempt to commit sexual assault, and aggravated assault, and on a separate occasion of three counts of burglary, and of theft by receiving stolen property and criminal attempt to commit burglary. He was over eighteen at the time of those offenses and over twenty-one when the present crimes were committed. See N.J.S.A. 2C:44-3a. Further, although he did not use any words of art, the judge in essence concluded that "an extended term [was] `necessary for the protection of the public.'" Dunbar, supra, 108 N.J. at 90, 527 A.2d 1346 (quoting Hester v. State, 503 So.2d 1342, 1344 (Fla. Dist.Ct.App.1987), approved in part and quashed in part, 520 So.2d 273 (Fla.1988)). And based on his justified assessment of the aggravating and mitigating factors, there is no basis to interfere with imposition of a life sentence, albeit at the top of the range for an extended term on a first degree crime. See State v. Roth, 95 N.J. 334, 363-66, 471 A.2d 370 (1984); see also N.J.S.A. 2C:43-7a(2); 2C:44-1f(1). The twenty-five year period of parole ineligibility flows therefrom. N.J.S.A. 2C:43-7(b); N.J.S.A. 30:4-123.51b.
As the Supreme Court in Dunbar stated:
It is not necessary that every sentence be a discourse. A brief reference to the reasons for imposing the extended term, once the minimal conditions are met, a recital of the specific aggravating and mitigating factors found and their balance, and the reasoning that led to the choice of the base and parole ineligibility terms will suffice to explain the sentence.

[108 N.J. at 97, 527 A.2d 1346.] *553 We therefore uphold the life sentence for an armed robbery with twenty-five years to be served before parole eligibility.
Defendant also contends that the imposition of consecutive sentences on counts three, ten, twelve, fourteen, seventeen and nineteen is excessive. He does not challenge the individual sentence imposed on each count, and the parties do not consider the impact of the Graves Act, N.J.S.A. 2C:43-6c.
A sentencing court is required to expressly set forth on the record its reasons for a consecutive sentence. State v. Miller, 108 N.J. 112, 122, 527 A.2d 1362 (1987). Moreover, in fashioning a sentence with a consecutive period of incarceration, the court must focus on the overall fairness of the sentence itself. State v. Ghertler, 114 N.J. 383, 391, 555 A.2d 553 (1989); Miller, 108 N.J. at 122, 527 A.2d 1362. Here, the judge stated reasons, but defendant asserts they were insufficient and that the overall sentence was unfair.
Each conviction made consecutive was for a distinct offense which occurred on a different date. Two of the victims were robbed more than once (Testerman and Maloney), and three of the consecutive sentences related to the same victim, Angela Maloney (armed robbery, counts ten and nineteen, and burglary, count twelve).
In State v. Yarbough, 100 N.J. 627, 643-44, 498 A.2d 1239 (1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1193, 89 L. Ed.2d 308 (1986), our Supreme Court announced guidelines regarding the imposition of consecutive or concurrent sentences. The Court stated the following criteria should be considered:
(1) there can be no free crimes in a system for which the punishment shall fit the crime;
(2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
(3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:
(a) the crimes and their objectives were predominantly independent of each other;
(b) the crimes involved separate acts of violence or threats of violence;
(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
(d) any of the crimes involved multiple victims;
(e) the convictions for which the sentences are to be imposed are numerous;
(4) there should be no double counting of aggravating factors;
(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense; and
(6) there should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms (including an extended term, if eligible) that could be imposed for the two most serious offenses.
[100 N.J. at 643-44, 498 A.2d 1239 (citations omitted).]
We are aware that Yarbough has been affected by statute and that under N.J.S.A. 2C:44-5a, as it now stands, "[t]here shall be no overall outer limit on the cumulation of consecutive sentences for multiple offenses." See State v. Brown, 138 N.J. 481, 559-60, 651 A.2d 19 (1994). However, the Code's general purposes governing sentencing still include the "safeguard[ing of] offenders against excessive, disproportionate or arbitrary punishment," N.J.S.A. 2C:1-2b(4), and the Yarbough guidelines must be considered in that context. Moreover, it is not always consistent for the State to oppose severance or seek joinder of offenses because the offenses, as here, were "connected together or constitut[ed] parts of a common scheme or plan," R. 3:7-6,[10] and then assert they were so distinct or separate as to warrant consecutive sentences.
Notwithstanding the deference to which the sentencing judge is entitled, State *554 v. Jarbath, 114 N.J. 394, 399-401, 555 A.2d 559 (1989); Roth, supra, 95 N.J. at 365-66, 471 A.2d 370; see also State v. O'Donnell, 117 N.J. 210, 215-16, 564 A.2d 1202 (1989), we are satisfied that a life sentence (at the top of the range for the extended term on a first degree crime), with the twenty-five year parole ineligibility term thereon on count three, together with six consecutive sentences (five of twenty years with seven years each before parole eligibility and one of five years) is excessive in the aggregate. Stated differently, while the sentence on each count may itself be justified, the aggregate sentence shocks our judicial conscience. State v. Roth, supra, 95 N.J. at 364-65, 471 A.2d 370. Even the new "three strikes and you're in law," which relates to armed robberies, N.J.S.A. 2C:43-7.1b,[11] recognizes that a person serving mandatory extended terms (for a single qualifying offense) should normally be paroled at age seventy once he has served "at least 35 years in prison...." See N.J.S.A. 2C:43-7.1e. Accordingly, we direct that defendant's aggregate sentence be modified so that defendant becomes eligible for parole at age seventy after serving in this case almost thirty-nine years (which is more than the thirty-five required by N.J.S.A. 2C:43-7.1e, where it applies).
Because the trial judge made all of the sentences consecutive to count three, not to each other, a new judgment is required and we direct the trial judge to modify the sentences to impose two consecutive sentences of twenty years with seven years each without parole eligibility, following the life sentence with twenty-five years before parole eligibility, so that the aggregate sentence will be life imprisonment plus forty years, with thirty-nine years of parole ineligibility, which would make defendant eligible for parole at age seventy.
The convictions are affirmed, and the matter is remanded to the Law Division for modification of the judgment.
NOTES
[1] That count was dismissed during the trial.
[2] The judgment does not so provide with respect to the terms imposed; each of the consecutive sentences was made consecutive to count three, not to each other. However, the parties agree as to the intent of the sentence imposed by the trial judge who said that "so there is no misunderstanding, the Court has imposed a term of life plus 105 years with a 60-year period of parole ineligibility," and it is controlling. See State v. Womack, 206 N.J.Super. 564, 571, 503 A.2d 352 (App.Div.1985), certif. denied, 103 N.J. 482, 511 A.2d 658 (1986).
[3] Some of the background is taken from the stipulated facts produced for the motion to suppress and some from the trial. In his pro se supplemental brief defendant quotes and attaches a report of Detective Salvatore which is consistent with these facts.
[4] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968). In his pro se supplemental brief, defendant contends he was "seized" and "placed under arrest" inside the store and that the frisk occurred after the arrest.
[5] An evidentiary hearing was conducted concerning the admissibility of defendant's statements.
[6] The court found the rights were given in Spanish and knowingly waived. Referring to defendant's conduct at a bail hearing, the judge also concluded that defendant had "knowledge of the English language and ability to communicate in English."
[7] Joseph Tammaro did not testify, but Elizabeth and Diane Grangula described events at his home. Angela Leonardi testified as to events involving her husband.
[8] To the extent defendant's argument may also be challenging the initial investigatory stop, or an arrest immediately before the frisk, it is rejected. Cf. State v. Dickey, 152 N.J. 468, 706 A.2d 180 (1998) (holding that investigative detention of defendant following traffic stop, for more than two hours, exceeded bounds authorized by Terry). In his pro se supplemental brief, defendant claims that his trial counsel was ineffective because "[a]ppointed counsel did not move to suppress evidence obtained as a result of the exploitation of an illegal arrest." Based on the stipulated facts, the absence of an argument as now phrased by defendant, would not have affected the result. See Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed. 2d 674, 698 (1984); State v. Fritz, 105 N.J. 42, 63, 519 A.2d 336 (1987).
[9] Even considering this as hearsay, it did not affect the result in light of the other direct evidence. See State v. Bankston, 63 N.J. 263, 268-69, 307 A.2d 65 (1973).
[10] No issue of joinder was raised in this case.
[11] An armed robbery may also be subject to N.J.S.A. 2C:43-7.1a (life imprisonment without parole) if the defendant committed the prior requisite offenses. See N.J.S.A. 2C:43-7.1a,b(1),(2).