# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1612-15T2

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MICHAEL F. CALDERON, a/k/a
MICHAEL FERNANDO CALDRON,
and MICHAEL CALDERONE,

     Defendant-Appellant.

_____

Argued telephonically May 20, 2020 –
Decided August 5, 2020

Before Judges Koblitz, Gooden Brown, and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 15-02-0461.

Joseph J. Russo, Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Joseph J. Russo, of counsel and on the briefs).

Barbara A. Rosenkrans, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Acting Essex

County Prosecutor, attorney; Barbara A. Rosenkrans, of counsel and on the brief).

PER CURIAM

Defendant Michael Calderon appeals from his November 17, 2015 amended judgment of conviction and sentence on forty-four counts of crimes involving the sexual assault of Jenny,[1] a child less than thirteen years old, between July 1, 2005, and August 31, 2011. A jury convicted defendant of all forty-four counts of a superseding indictment that charged him with three counts of second-degree endangering the welfare of a child for whom he had a duty to care, N.J.S.A. 2C:24-4(a), and three counts of first-degree aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1), per year for seven years based on different sexual behaviors, plus an additional count of first-degree videotaping sex acts between himself and Jenny, N.J.S.A. 2C:24-4(b)(3), and a count of second-degree reproducing an image of Jenny in a prohibited sexual act, N.J.S.A. 2C:24-4(b)(4).

At a status conference for the initial indictment, defendant rejected a plea offer with a maximum sentence that the court characterized as "eight flat time

---

[1] We use pseudonyms to refer to the victim of child sexual abuse and her family to preserve her anonymity. R. 1:38-3(c)(9).

2                                                                                    A-1612-15T2

served at sentencing," which we understand to mean eight years in prison with no parole ineligibility, with credit given for the four years he had spent in pre-trial incarceration. Defendant rejected the plea offer because he did not wish to be deported. After trial on the superseding indictment, the trial court sentenced defendant, who was in his sixties, to consecutive twenty-year terms on eight of the first-degree counts, a total of 160 years in prison. Seven of those first-degree counts were subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, constituting a 119-year parole bar on defendant.[2] Defendant argues that his convictions must be reversed because the court erroneously admitted testimony about Child Sexual Abuse Accommodation Syndrome (CSAAS), the court failed to adequately inform him of the maximum possible sentence he might face, the court improperly allowed the State's medical witness to testify about the findings and significance of her physical examination of the child, and the prosecutor committed misconduct during closing arguments. We are not persuaded by these arguments. We affirm the convictions, but reverse and remand for resentencing.

---

[2] The November 17, 2015 amended judgment of conviction mistakenly states that total custodial term is 160 years with NERA.

A-1612-15T2

Jenny was born in 2000, to Monica and Richard. At the time of Jenny's birth, Monica was living with another man, Charles. Following Jenny's birth, Monica and Charles had two sons together. Richard visited Jenny when she was a baby and paid child support for her. The Division of Child Protection and Permanency, then called the Division of Youth and Family Services (Division), removed the three children from Monica's care in 2005.

Jenny and her two half-brothers were initially placed with Monica's mother, but when that did not work out, the children were placed with Charles' mother, Mary. Mary was the biological grandmother of the boys, but had no biological relationship to Jenny. At the time Jenny and her half-brothers moved in with Mary, Mary was living in a Newark apartment with defendant and their three daughters, Lori, Lilly, and Elizabeth. Defendant, however, left the family home in late 2009 or early 2010 and moved into a basement apartment nearby. In 2011, Mary, her daughters, her grandsons and Jenny relocated to an apartment on the same street where defendant lived. Lori had a boyfriend, John, who started living with her in late 2010.

Mary died suddenly in March 2011, and Lori, who was then an adult, started caring for the children. At that time, Richard intensified his efforts to obtain custody of Jenny. After a DNA test, which conclusively proved that

4

Jenny was his daughter, the Division placed Jenny with Richard in August 2011.

Richard testified that around the time the Division first became involved with Jenny, he was in the hospital for health problems, which necessitated a liver transplant. He explained that he visited Jenny about ten times between 2005 and 2011. When Richard went to pick up Jenny from Mary's house, he was often directed to defendant's apartment. He observed that the interaction between Jenny and defendant was "a little too close tha[n] was normal." Once at a barbeque, he saw Jenny and defendant holding each other. He complained to Mary about Jenny sleeping at defendant's house and demanded to know what was going on.

About a week after then eleven-year-old Jenny came to live with Richard, he asked her if anything had happened to her at defendant's house. According to Richard, after he told her that she was safe with him, Jenny cried and said, "Yes, it happened." In response to further inquiries, Jenny told him that defendant had sex with her. At that point, Richard called Jenny's Division case worker, who came to question Jenny personally. Richard and Jenny then went to Newark police headquarters for interviews on September 19 and September 30, 2011, and ultimately were questioned at the Essex County Prosecutor's Office.

A-1612-15T2

At the time of trial, Jenny was fifteen years old and in the ninth grade. She remembered living with her mother, Monica, and half-brothers and then going to live with her maternal grandmother, before living with Mary and her family, including defendant.

Jenny testified that she, Mary, and the two boys slept in a large empty room that was supposed to be the apartment's living room. Lori and Lilly shared one bedroom and defendant and Elizabeth shared another. Jenny said she did the cleaning and laundry and was responsible for getting her half-brothers dressed and ready for school in the morning. She sometimes went to school herself but missed three out of five days some weeks. Mary drank and hit Jenny with anything that was available, yelled at her and ordered her around. If Mary became too violent with Jenny, defendant intervened and told Mary to stop.

Jenny recalled an occasion when Mary was out of the house and defendant got into bed with her when she was sleeping. Defendant took his pants off and had sex with her, touching the inside of her vagina with his penis. Defendant told Jenny not to tell anyone about it. Jenny could not remember how old she was when this happened.

After defendant moved out of the family home, he came to Mary's apartment after work on Fridays and took Jenny to his own place. He gave Mary

6

liquor so that he could take Jenny. Jenny remembered one time when defendant did not bring liquor and Mary would not let her go with him. Mary and defendant argued, and only after defendant returned from buying liquor for her, did Mary allow Jenny to go with defendant.

Jenny stayed in defendant's basement apartment until Sunday or sometimes Monday. Jenny testified: "[Defendant] made me take off my pants, have sex. Sometimes [Elizabeth] would be in the room. And I would sleep by the wall . . . . [H]e would still pick me up and [take] me to his room." She testified that his penis touched her vagina, "inside my mouth or my butt." When he did this, she saw something come out of his penis: "It looked like milk. It was watery." He assaulted her more than once a week, mostly at his apartment on the weekends.

Jenny testified that defendant took videos of her while they were having sex. Defendant told her not to put her head in the video, because he sold the tapes to make money. Sometimes while they were having sex, Jenny turned her head and saw the video at the same moment. Once defendant wanted Jenny to watch one of the videos with him while they were sitting on the bed together. She pretended to watch, but mostly turned away. She explained: "I didn't like the fact how I was being taken the video [sic]."

7

Jenny recounted that when she saw a photograph of herself in her kindergarten cap and gown at her father's house, some memories came back to her. She recalled walking down the aisle at school thinking, "I can't believe this is happening to me." Jenny testified that defendant assaulted her during every school grade.

After Mary died, Lori was in charge of Jenny. Lori's boyfriend John lived with them and he sexually abused her, touching her vagina with his penis three or four times a week. She did not remember John putting his penis in any other part of her body.

Jenny said that defendant had sex with her starting at age four and continuing until age eleven. It stopped when Jenny went to live with her father, Richard. After being at Richard's house in Union City for a week, Jenny told him that defendant had abused her. She decided to tell him because she finally had the chance to speak freely to someone and was no longer living in Newark. Jenny admitted that she did not tell her father everything that happened at first.

Jenny said that her life changed when she left Newark and moved in with her father: "I get to speak free now." She does not get woken up by someone wanting to have sex with her, does not get hit every day, and does not live with drunk people.

A-1612-15T2

On cross-examination, Jenny admitted telling different people different accounts of the abuse. The variations mostly concerned the age when the abuse started, with Jenny telling the grand jury, Division worker, and doctors that the abuse started when she was in third grade, when she was eight or nine. She said that John started abusing her when she was nine or ten. She explained that when she told the grand jury that the abuse "happened like . . . every day. Like—Monday, Tuesday, Wednesday, Thursday," she meant it could have happened on any day of the week. She never changed her account of it happening two or three times a week.

Several law enforcement officers testified concerning their interviews with Jenny and subsequent investigation of her allegations. Videotapes of Jenny's forensic interviews from September 2011 were played for the jury. Detectives from the Essex County Prosecutor's Office explained that searches of defendant's apartment and examination of his computers turned up neither video nor electronic recordings of him sexually assaulting Jenny.

Dr. Susan Esquilin, a licensed psychologist, testified as an expert in CSAAS. She explained that she never met Jenny and did not review any of the police reports, transcripts or Division records. Esquilin discussed the work of psychiatrist Dr. Roland Summit, M.D., who identified five characteristics often

9

associated with sexually abused children: secrecy, helplessness, accommodation, delayed disclosure, and recantation. She addressed each of these factors in detail, explaining why children keep abuse a secret, feel powerless with respect to adults and make psychological accommodations. Because of the secrecy, helplessness and entrapment, children often delay disclosing the abuse or disclose it in bits and pieces over time. Further, if the child is in a non-supportive environment, she may recant. Esquilin explained that CSAAS is not a syndrome in the classical sense of the word, but rather is a set of "dynamics" often seen in child sexual abuse situations.

Pediatrician Dr. Nina Agrawal testified concerning her physical examinations of Jenny and as an expert in child sexual abuse. The first time Jenny came to see her in October 2011, Jenny said: "Somebody did it to me. They did sex." Jenny was tearful when she said that defendant abused her from the age of eight until she moved in with her father at age eleven. She said that defendant touched her genitalia, mouth and "butt" with his penis.

Jenny returned to Agrawal a week later for a physical examination and laboratory testing. Agrawal saw no physical signs of trauma or infection but explained that a lack of physical trauma was not unusual in a child of Jenny's age who was in the early stages of puberty. She said that medical examinations

are normal in ninety-five percent of children who have been sexually abused.

Jenny saw Agrawal for a third time in December 2011. At that time Agrawal had the results of the laboratory tests showing that Jenny's anal culture and urine test were positive for a chlamydia[3] infection. Agrawal stated that a positive rectal culture for chlamydia is considered "diagnostic" according to the Centers for Disease Control and Prevention (CDC): "Diagnostic means it's the gold standard." A positive culture means that sexual abuse occurred.

Defendant presented testimony from Joanne Glaeser, a clinical social worker at the Hackensack Medical Center. She stated that when she interviewed Jenny on August 7, 2012, Jenny told her that John had sexually abused her through vaginal, anal and oral penetration. Glaeser did not perceive Jenny as being confused as to the identity of her abuser; to the contrary, Jenny was "very distinct" as to what happened in which house.

Defendant's daughter Lori testified that defendant never took Jenny from Mary's house alone, as Jenny was always accompanied by one of the other children and after Mary's death, Jenny "rarely" went out with defendant. Lori stated that Jenny acted like a "regular child" and "was always happy." She did

---

[3] Agrawal explained that chlamydia is a bacterium that is spread by sexual contact. It can be treated successfully with antibiotics.

A-1612-15T2

not notice any change in Jenny's behavior over time. John and Lori were no longer together at the time of trial. Lori said that John was never alone with the children and denied that he sexually abused Jenny.

Defendant raises the following issues on appeal:

> POINT I: BECAUSE MR. CALDERON WAS MATERIALLY [MISLED] BY THE COURT AS TO HIS SENTENCING EXPOSURE FOR THE OFFENSES CHARGED IF CONVICTED, A VIOLATION OF HIS DUE PROCESS RIGHTS, REVERSAL AND REMAND ARE REQUIRED. (NOT RAISED BELOWED).
>
> POINT II: THE ADMISSION OF CSAAS TESTIMONY WAS IMPROPER, UNDULY PREJUDICIAL, AND DENIED MR. CALDERON THE FAIR TRIAL GUARANTEED BY THE FEDERAL AND STATE CONSTITUTIONS.
>
> A. BEFORE THE APPELLATE DIVISION AND THE NEW JERSEY SUPREME COURT, THE STATE CONCEDED THAT MR. CALDERON WILL RECEIVE THE "BENEFIT" OF "ANY CHANGES IN CSAAS JURISPRUDENCE" RELATED TO THE J.L.G.[4] REMAND, THEREFORE EQUITY DEMANDS THAT J.L.G. MUST APPLY TO THE INSTANT CASE. THE STATE IS ESTOPPED FROM TAKING AN INCONSISTENT POSITION BEFORE THIS COURT.
>
> B. EVEN IF EQUITY DOES NOT DEMAND THAT J.L.G. CONTROLS IN THIS MATTER, J.L.G. MUST

---

[4] State v. J.L.G., 234 N.J. 265 (2018).

BE RETROACTIVELY APPLIED TO THIS MATTER.

C. J.L.G. ALSO AFFIRMED AN OLD RULE OF LAW: EXPERTS MAY NOT PROVIDE TESTIMONY THAT IS NOT HELPFUL TO THE TRIER OF FACT OR THAT INFRINGES ON THE JURY'S RESPONSIBILITY TO DETERMINE CREDIBILITY. APPLICATION OF THAT OLD RULE REQUIRES REVERSAL OF DEFENDANT'S CONVICTIONS.

D. THE IMPROPER ADMISSION OF CSAAS EXPERT TESTIMONY IN THIS CASE WAS HARMFUL ERROR UNDER J.L.G.

E. THE IMPROPER ADMISSION OF CSAAS EXPERT TESTIMONY IN THIS CASE WAS HARMFUL ERROR UNDER PRE-J.L.G. PRECEDENT.

1. THE TRIAL COURT ERRED IN ADMITTING CSAAS TESTIMONY UNDER PRE-J.L.G. PRECEDENT.

2. THE CSAAS TESTIMONY OFFERED BY THE STATE WENT BEYOND ITS PERMISSIBLE SCOPE.

POINT III: THE TRIAL JUDGE ERRED IN PERMITTING THE PROSECUTOR TO INTRODUCE IRRELEVANT EVIDENCE THAT [JENNY] HAD CHLAMYDIA THEREBY DEPRIVING MR. CALDERON OF DUE PROCESS AND A FAIR TRIAL. U.S. CONST., AMEND. XIV; N.J. CONST.(1947), ART. 1, ¶ 10. (NOT RAISED BELOW).

13

POINT IV:  THE COURT ERRED IN PERMITTING AGRAWAL TO GIVE AN OPINION THAT [JENNY] WAS SEXUALLY ASSAULTED.  (NOT RAISED BELOW).

POINT V:  THE PROSECUTOR IMPERMISSIBLY SHIFTED THE BURDEN OF PROOF ON TO MR. CALDERON THEREBY DEPRIVING HIM OF A FAIR TRIAL.  U.S. CONST., AMEND. V, VI, XIV; N.J. CONST. ART. 1 PARA. 10.  (NOT RAISED BELOW).

POINT VI:  THE TRIAL WAS SO INFECTED WITH ERROR THAT EVEN IF EACH INDIVIDUAL ERROR DOES NOT REQUIRE REVERSAL, THE AGGREGATE OF THE ERRORS DENIED MR. CALDERON A FAIR TRIAL.  (NOT RAISED BELOW).

POINT VII:  MR. CALDERON'S CURRENT SENTENCE OF 160 YEARS MUST BE REDUCED TO NO MORE THAN [EIGHTY] YEARS BECAUSE THE IMPOSITION OF A LONGER SENTENCE THAN THE COURT LED MR. CALDERON TO BELIEVE HE COULD RECEIVE AT PLEA CUTOFF CONSTITUTES A VIOLATION OF MR. CALDERON'S RIGHT TO DUE PROCESS OF LAW. (NOT RAISED BELOW).

POINT VIII:  THE SENTENCE IS MANIFESTLY EXCESSIVE BECAUSE, AFTER EXPIRATION OF HIS PRISON TERM, MR. CALDERON WILL BE CLOSELY MONITORED FOR THE REST OF HIS LIFE AND WILL BE A LOW RISK TO RE-OFFEND.

I.  Failure to Inform Defendant of Prison Exposure.

In Point I, defendant argues that he was materially misled by the court as

14                                                           A-1612-15T2

to his maximum sentencing exposure for the offenses charged in the superseding indictment. He claims that he elected to go to trial after being informed that he faced no more than eighty years with sixty-eight years of parole ineligibility, yet he was ultimately sentenced to 160 years, with 119 years of parole ineligibility. He contends that because he did not exercise his constitutional right to trial knowingly and intelligently, he is entitled to a new trial.

Rule 3:9-1(f) requires the court to hold a pretrial conference to determine whether "the defendant understands . . . the State's final plea offer, if one exists[, and] the sentencing exposure for the offenses charged, if convicted." Such a pretrial conference was held at the end of May 2014 in connection with the initial indictment, during which the court informed defendant that, if convicted, he could be sentenced to "eighty years with a sixty-eight-year period of parole ineligibility." Defendant acknowledged that he understood the plea offer and his sentencing exposure.

Defendant's initial indictment consisted of eight counts, charging crimes occurring between January 1, 2009, and August 31, 2011. Three counts alleged aggravated sexual assault, N.J.S.A. 2C:14-2(a)(1), differentiated by the type of sexual penetration that occurred—vaginal, anal, or oral. Each count of aggravated sexual assault was accompanied by a count of child endangerment,

N.J.S.A. 2C:24-4(a), again differentiated by the type of sexual penetration. The remaining two counts charged defendant with videotaping sex acts between himself and Jenny.

Once the State learned that defendant began abusing Jenny when she was five, the State requested time to obtain a superseding indictment. Defendant opposed the request, contending a delay would violate his Sixth Amendment right to a speedy trial. After reviewing the procedural history of the matter and noting that most delays were caused by defense motions, the court granted the State's request. It then addressed defense counsel:

> [Y]ou want to make things quicker? I'll tell you how. You know what's going to be in the superseding indictment. You know it's—you know it's going to have an enlarged timeframe. You have some appearances that I would regard as perfunctory, arraignment conferences, status conferences. The defense knows what's coming. So does the [S]tate.
>
> So, you may be—may be able to shorten the time period between the time the indictment is returned and the time of the new trial as opposed to just starting all over again. That's a suggestion by the court. The defendant can do whatever the defense wants. They have their rights and so does the [S]tate.

Defense counsel responded that defendant wanted an immediate trial date.

The court later asked if defendant wanted another pretrial conference where he would be told about a revised plea offer. The prosecutor responded

that defendant has never been interested in a plea offer because of his Immigration and Customs Enforcement detainer. Defense counsel confirmed the prosecutor's statement and again asked for a speedy trial date. No revised plea offer was ever tendered.

After the superseding indictment was returned, the court held a pre-arraignment conference at which defendant waived a reading of the indictment. Defense counsel acknowledged receipt of the indictment and entered a not guilty plea on all counts. The court did not take that opportunity to inform defendant of his greater sentencing exposure on the new indictment.

Defendant relies on a series of cases in which the reviewing court found error in the trial court's failure to advise defendant of his maximum sentencing exposure. In State v. Kovack, 91 N.J. 476, 483-85 (1982), for example, the Court remanded for resentencing because the trial court had failed to inform the defendant, who had entered into a plea agreement, that a period of parole ineligibility was likely to become part of his sentence. In State v. Martin, 110 N.J. 10, 18-19 (1988), another guilty-plea case, the Court required the court to inform a defendant about the possibility of an extended or enhanced term. In State v. Kordower, 229 N.J. Super. 566, 578 (App. Div. 1989), we found that the trial court erred by not advising the defendant of the maximum sentence for

each of the charged offenses before accepting her decision to represent herself pro se.

In State v. Thomsen, 316 N.J. Super. 207, 209, 214-15 (App. Div. 1998), we reversed the defendant's conviction because his indictment had graded his crime as one of the fourth degree, yet after he was convicted of that offense, the trial court re-classified the crime as one of the second degree at sentencing to comply with the statutory amendment made effective before the conviction. We wrote:

> We begin with the general principle that every person is entitled to know, with reasonable exactitude, the penal consequences of any criminal charge he or she is called upon to defend against. As soon as it became apparent that the trial had been conducted under a misapprehension concerning the gravity of the crime charged, i.e., the penal consequences to which defendant was subject, this defendant could not validly be convicted of a crime of greater degree than he, and everyone else involved, understood to be charged.
>
> [Id. at 214 (citations omitted).]

The situations addressed by these cases, of course, is not present here where defendant did not accept a plea bargain, did not represent himself and did not have his offenses regraded. Nevertheless, these cases combined with Rule 3:9-1(f), make clear that the trial court was required to advise defendant of his maximum sentencing exposure under the superseding indictment.

The difference between facing an eighty-year term and a 160-year term, however, could not reasonably have affected defendant's decision-making. He was sixty-one years old at the time of the initial pretrial conference when he was informed of his prison exposure. He knew that rejecting the plea bargain, conviction and a sentence of sixty-eight years without parole would mean serving the rest of his life in prison. Under the circumstances, the court's sentencing exposure pronouncement in connection with the initial indictment advised defendant with "reasonable exactitude" of the penal consequences of the charges levied in the superseding indictment: the rest of his life in prison. See Thomsen, 316 N.J. Super. at 214.

Invited error is also relevant. "The doctrine of invited error operates to bar a disappointed litigant from arguing on appeal that an adverse decision below was the product of error, when that party urged the lower court to adopt the proposition now alleged to be error." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 340 (2010) (quoting Brett v. Great Am. Recreation, 144 N.J. 479, 503 (1996)); see also State v. Jenkins, 178 N.J. 347, 358 (2004) (holding that the defendant could not ask the trial court to take a certain course of action and later condemn the very procedure that he sought as prejudicial error). "The doctrine of invited error 'is based on considerations of fairness and

A-1612-15T2

preservation of the integrity of the litigation process.'" M.C. III, 201 N.J. at 340 (quoting Brett, 144 N.J. at 503).

Here, the court gave defendant the choice to start over with the superseding indictment and proceed with the status conference to which he was entitled. Defense counsel made clear that defendant did not want to delay the trial and repeatedly asked that a trial date be set immediately. Because counsel urged the court to proceed quickly to trial without a pretrial conference, the doctrine of invited error supports our decision not to reverse and remand for a new trial. Although the trial court should have informed defendant of his prison exposure in the superseding indictment, given the unusual circumstances here, this error does not require a new trial.

## II. CSAAS Testimony.

In Point II, defendant argues that the admission of the CSAAS testimony was improper, prejudicial and denied him a fair trial.

### A. Application of J.L.G.

Defendant argues that J.L.G.'s finding that CSAAS testimony is inadmissible "junk science" governs this matter. In J.L.G., 234 N.J. at 280-89, the Court reviewed Dr. Summit's scholarship when considering whether CSAAS evidence was sufficiently reliable to be admissible under the standard set forth

in <u>Frye v. United States</u>, 293 F. 1013, 1014 (D.C. Cir. 1923). It assessed the viability of CSAAS evidence in light of testimony adduced at a remand hearing at which experts addressed shortcomings in Summit's work. <u>Id.</u> at 289-92. It noted that in the decades since Summit's article first appeared, CSAAS has not been recognized by the American Psychiatric Association, the American Psychological Association, or the <u>Diagnostic and Statistical Manual of Mental Disorders</u>. <u>Id.</u> at 272. Further, it observed that the very "notion of a child abuse accommodation 'syndrome' has been . . . undermined by a number of scientific studies." <u>Ibid.</u> The Court concluded: "We therefore hold that expert testimony about CSAAS in general, and its component behaviors other than delayed disclosure, may no longer be admitted at criminal trials." <u>Ibid.</u>

The Court cautioned that evidence about delayed disclosure could only be presented if it satisfied N.J.R.E. 702's requirement that it be beyond the understanding of the average juror. <u>Ibid.</u> Where a child offers a rational explanation about why she delayed reporting abuse, a jury may not need help from an expert to evaluate that explanation. <u>Ibid.</u>

Esquilin's testimony was consistent with the exposition of CSAAS set forth in <u>J.L.G.</u> Her testimony with regard to secrecy, helplessness, entrapment and retraction was clearly inadmissible under the holding in <u>J.L.G.</u> Further,

testimony concerning delayed disclosure was not needed here as Jenny offered a rational explanation for the delay. According to Jenny, she told her father about the abuse after moving in with him because she finally felt safe. Her explanation was well within the ability of an average juror to evaluate.

Thus, under the reasoning of J.L.G., Esquilin's testimony concerning CSAAS should not have been admitted at defendant's trial.

## B. Retroactivity of J.L.G.

Defendant argues that the holding in J.L.G. should be applied retroactively. In State v. G.E.P., 458 N.J. Super. 436, 444-48 (App. Div.), certif. granted, 239 N.J. 598 (2019), we considered whether J.L.G. announced a new rule of law, and if so, whether the new rule should be applied retroactively.[5] Because the cases before us were pending on appeal at the time J.L.G. was issued, we focused our analysis on "pipeline retroactivity," concluding it was appropriate. Id. at 446-47. Thus, J.L.G. applies and Esquilin's testimony about CSAAS was not admissible.

---

[5] Where a new rule of law has been announced, the four options are to apply the rule: (1) prospectively only; (2) prospectively plus application to the case announcing the new rule; (3) retroactively to cases in the "pipeline" pending appeal; and (4) retroactively to all cases. G.E.P., 458 N.J. Super. at 445.

## C. Harmless Error.

Defendant argues that the admission of the CSAAS testimony was harmful error that necessitates reversal of his convictions. Referring to the State's reliance on Esquilin's testimony in summation, he argues that "the jury was exposed to [the] fullest extent of this unreliable evidence and was encouraged to use that evidence to find that abuse occurred."

In J.L.G., the Court found that it was error to admit CSAAS testimony "as to the theory in general and the behaviors that are not generally accepted by the scientific community." 234 N.J. at 306. It also disapproved of the testimony concerning delayed disclosure because the child "gave reasons for the delay that were not beyond the ken of the average juror." Ibid. Nevertheless, it found the "errors harmless in light of the overwhelming evidence of [the] defendant's guilt." Ibid.

The Court explained: "An error is harmless unless, in light of the record as a whole, there is a 'possibility that it led to an unjust verdict'—that is, a possibility 'sufficient to raise a reasonable doubt' that 'the error led the jury to a result it otherwise might not have reached.'" Ibid. (quoting State v. Macon, 57 N.J. 325, 335-36 (1971)).

In each of the four consolidated appeals before the court in G.E.P., we

found the erroneous admission of CSAAS testimony was harmful. 458 N.J. Super. at 451-65. We explained that unlike J.L.G. where the evidence of guilt was overwhelming, "[i]n all four cases on review, the State relied almost entirely on the credibility of the victim. All victims gave 'straightforward reasons' for their delay in reporting." Id. at 464. We concluded that the admission of CSAAS expert testimony "severely impaired the defense's ability to test the victim's credibility" and "was 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" Id. at 465 (quoting Macon, 57 N.J. at 336).

Unlike J.L.G., where the victim used her iPhone to record an episode of sexual abuse, 234 N.J. at 274, here there was no objective evidence of defendant having sex with Jenny. Despite Jenny's claim that defendant recorded their sexual encounters, no recordings were found in searches of defendant's apartment and computers. Like the G.E.P. cases, the evidence against defendant was based solely on the credibility of Jenny's testimony. Unlike the G.E.P. cases, however, defendant did not dispute the fact that Jenny was sexually abused. Indeed, he conceded that she had been abused, but argued that the perpetrator was Lori's then-boyfriend, John. For that reason, the CSAAS evidence was not probative of whether defendant abused Jenny. Had the jury

24

believed every word of Esquilin's testimony and concluded that Jenny was a sexually abused child, it still needed to evaluate her credibility to determine whether she was abused by defendant or just John.

Under these unusual circumstances, where the victim claimed abuse by another person as well as defendant, the erroneous admission of CSAAS testimony would not have led the jury to a result it otherwise might not have reached. For that reason, the error was harmless and presents no basis to reverse defendant's convictions.

## III. Evidence of Chlamydia Infection.

In Point III, defendant argues that the court erred in allowing Agrawal to testify that Jenny's anal culture and urine test were positive for chlamydia infection. He claims that such evidence had no relevance to whether he sexually assaulted Jenny because chlamydia can be transmitted in other ways beside sexual contact. Further, he notes that it was stipulated that he was tested for chlamydia and the results came back negative. He contends that the chlamydia evidence was intended "to engender sympathy from the jury" and was "incredibly prejudicial."

A court's evidentiary rulings are "entitled to deference absent a showing of abuse of discretion, i.e., there has been a clear error of judgment." State v.

Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).  "An appellate court applying this standard 'should not substitute its own judgment for that of the trial court, unless "the trial court's ruling is so wide of the mark that a manifest denial of justice resulted."'"  State v. J.A.C., 210 N.J. 281, 295 (2012) (quoting Brown, 170 N.J. at 147).

The trial court did not rule on the admissibility of Agrawal's testimony because defendant raised no objection to it.  In fact, during pre-trial proceedings, with consent of defendant, the court admitted Agrawal's testimony, writing:

> THE COURT FURTHER FINDS that the State gave prior notice to the Defendant that the statement would be offered into evidence and with the consent of . . . [d]efendant the testimony of Dr. Nina Agrawal, the pediatrician who examined [Jenny] at Audrey Hepburn Children's House in Hackensack NJ in October through December, 2011 will be admitted as a fact witness, including physical examination results and statements made to her by [Jenny] for purposes of diagnoses and treatment as per N.J.R.E. 803(c) and as an expert witness in child abuse.
>
> [(emphasis added).]

Defendant's consent to Agrawal's testimony that Jenny had chlamydia was clearly part of his trial strategy, as reflected by the stipulation read to the jury that defendant "was tested for chlamydia on June 8, 2012, and that the results came back negative."  Defendant wanted the jury to know that Jenny had

chlamydia and he did not. As discussed previously, the doctrine of invited error "acknowledges the common-sense notion that a 'disappointed litigant' cannot argue on appeal that a prior ruling was erroneous 'when that party urged the lower court to adopt the proposition now alleged to be error.'" State v. A.R., 213 N.J. 542, 561 (2013) (quoting M.C. III, 201 N.J. at 340).

Evidence of Jenny's chlamydia infection was properly admitted even absent defendant's consent. Evidence is relevant if it has "a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. "All relevant evidence is admissible, except as otherwise provided in [the New Jersey rules of evidence] or by law." N.J.R.E. 402.

The question before the jury was whether Jenny was sexually abused by defendant. Evidence showing that Jenny was sexually abused by someone certainly had a tendency to prove a fact of consequence in the action. It was therefore both relevant and admissible. For that reason, the admission of the chlamydia evidence was not plain error, as it did not possess the clear capacity to bring about an unjust result. R. 2:10-2.

### IV. Opinion of Medical Witness.

In Point IV, defendant argues that the court erred by allowing Agrawal to give an opinion that Jenny was sexually assaulted. He claims that Agrawal's

27

statement that a positive chlamydia culture is diagnostic of sexual abuse "unfairly answered the ultimate issue before the jury" and that Agrawal should have limited her testimony to "no more than a clinical description of [the] chlamydia."

Defendant consented to Agrawal's testifying as both a fact witness and as an expert in child abuse. As discussed previously, defendant is therefore barred by the invited error doctrine from challenging Agrawal's testimony on appeal.

Also, defense counsel did not object when Agrawal offered her opinion at trial. "For sound jurisprudential reasons, with few exceptions, 'our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available.'" State v. Witt, 223 N.J. 409, 419 (2015) (quoting State v. Robinson, 200 N.J. 1, 20 (2009)). Moreover, courts "may infer from the lack of an objection that counsel recognized that the alleged error was of no moment or was a tactical decision to let the error go uncorrected." State v. Swint, 328 N.J. Super. 236, 256 (App. Div. 2000).

Finally, even if the merits of defendant's appellate argument are considered, Agrawal's testimony was properly admissible. During her testimony, Agrawal said that a positive test for chlamydia proves a child has

been sexually abused. Later, she repeated that "[a]ccording to the [CDC], [chlamydia is] not transmitted by what we call casual transmission. It's sexual contact."

"As fact witnesses, . . . treating [physicians] may testify about their diagnosis and treatment of [a patient's] disorder, including their determination of that disorder's cause." Stigliano v. Connaught Labs., Inc., 140 N.J. 305, 314 (1995); see also N.J.R.E. 701. "Because the determination of the cause of a patient's illness is an essential part of diagnosis and treatment, a treating physician may testify about the cause of a patient's disease or injury." Ibid. Agrawal was a child-abuse pediatrician, who diagnosed and treated child victims of sexual abuse. In order to properly treat Jenny, it was necessary for Agrawal to diagnose the presence of chlamydia and determine the cause of the infection. Her testimony in that regard was permissible fact testimony under N.J.R.E. 701 and Stigliano.

Further, Agrawal's testimony was proper expert testimony. N.J.R.E. 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Agrawal's

professional qualifications to render an expert opinion were never questioned and the diagnostic significance of a chlamydia infection is not a matter within the ken of the average juror. Thus, her testimony was appropriate under N.J.R.E. 702.

Finally, Agrawal's testimony did not constitute an inadmissible net opinion. An expert's opinion must be based on "facts or data," which "[i]f of a type reasonably relied upon by experts in the particular field . . . need not be admissible." N.J.R.E. 703. If the expert offers only bare conclusions, unsupported by factual evidence, the testimony is inadmissible as a "net opinion." State v. Townsend, 186 N.J. 473, 494 (2006). "[A]n expert's testimony may be termed a 'net opinion' when the data on which it is based is perceived as insufficient, unreliable or contrary to the proponent's theory of the case." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 3 on N.J.R.E. 703 (2020).

"The net opinion rule has been succinctly defined as 'a prohibition against speculative testimony.'" Koruba v. Am. Honda Motor Co., 396 N.J. Super. 517, 525 (App. Div. 2007) (quoting Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997)). It "require[es] that the expert 'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Davis v. Brickman

Landscaping, Ltd., 219 N.J. 395, 410 (2014) (alteration in original) (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011)). The expert must be able to point to a generally accepted, objective standard of practice and not merely a standard personal to himself or herself. Ibid.

Agrawal did not go into great detail concerning how the samples were collected from Jenny nor the methodology used by the testing laboratory in identifying a positive chlamydia culture. Defendant, who had access to Agrawal's expert report, never challenged the admission of her testimony. Agrawal did explain that cultures were taken and sent to a diagnostic testing laboratory, and that a report was returned which was positive for chlamydia. Agrawal then cited to the CDC's "infections in children or sexual infections in children" classification as supporting her opinion that the presence of a chlamydia infection in a child Jenny's age was "diagnostic" of sexual abuse. Diagnostic testing reports are routinely relied upon by medical practitioners, and criteria established by the CDC are generally accepted, objective standards relied upon in the medical field. None of the characteristics of impermissible net opinions are present here. Agrawal's testimony that a chlamydia infection is diagnostic for sexual abuse was proper.

A-1612-15T2

## V.  Shifting the Burden of Proof.

In Point V, defendant argues that the prosecutor's comments during summation denied him a fair trial.  He claims the prosecutor's suggestion that he may have already been treated for chlamydia shifted the burden of proof by implying that it was his burden to show he had not been treated.

In her closing argument, defense counsel addressed Jenny's positive test results for rectal chlamydia and noted that unlike her claims as to defendant, which she repeatedly changed, Jenny had consistently claimed that John sexually abused her anally.  Counsel then stated: "Mr. Calderon was tested for chlamydia, and yes, it can be treated.  But if you're treated, there are medical records.  If there would have been medical records, you would have seen them with a big red bow on them."

The prosecutor responded:

> How do we know if the defendant was treated?  We don't know.  That's not something we can tell.  We can't prove that to you one way or the other.  Frankly, we don't know.  All we know, ladies and gentlemen, is [Jenny] had a sexually-transmitted disease when she was [eleven] years old, as she testified.

Defendant did not object to these statements, so the court had no opportunity to rule on their propriety or issue a curative instruction.  During its opening remarks to the jury, however, the court explained:

32

> The burden of proving each element of a charge beyond a reasonable doubt rests upon the State and that burden never shifts to the defendant. It is not the obligation or the duty of the defendant in a criminal case to prove his innocence or offer any proof relating to his innocence.

During its final jury charge the court similarly instructed that "[t]he burden of proving each element of a charge beyond a reasonable doubt rests upon the State and that burden never shifts to the defendant. The defendant in a criminal case has no obligation or duty to prove his innocence or offer any proof relating to his innocence."

"[I]t is well-established that prosecuting attorneys, within reasonable limitations, are afforded considerable leeway in making opening statements and summations." State v. DiFrisco, 137 N.J. 434, 474 (1994) (quoting State v. Williams, 113 N.J. 393, 447 (1988)). Further, prosecutors may respond to arguments made by defense counsel during summation, "even if [such] response tends to undermine the defense case." State v. Nelson, 173 N.J. 417, 473 (2002). Prosecutorial "misconduct [is] not grounds for reversal 'unless [the conduct] was so egregious as to work a deprivation of a defendant's right to a fair trial.'" Id. at 472 (quoting State v. Pennington, 119 N.J. 547, 566 (1990)).

In determining whether a reversal is warranted based on alleged prosecutorial misconduct, the reviewing court considers whether defense

counsel made a timely and proper objection. State v. Smith, 167 N.J. 158, 181-82 (2001). If no objection is made, the remarks usually will not be deemed prejudicial. If a defendant fails to object to statements later challenged on appeal, he or she must establish that the statements constituted plain error under Rule 2:10-2. State v. Feal, 194 N.J. 293, 312 (2008). Thus, in order to warrant a reversal there "must be . . . 'a reasonable doubt as to whether the error led the jury to a result that it otherwise might not have reached.'" Ibid. (quoting State v. Daniels, 182 N.J. 80, 102 (2004)).

The prosecutor's remarks did not mislead the jury as to defendant's burden of proof. Rather, the remarks were responsive to arguments made by defense counsel in summation. The court's jury charge clearly and correctly stated the applicable burden of proof, and the jury is presumed to have followed that instruction. See State v. Burns, 192 N.J. 312, 335 (2007) ("One of the foundations of our jury system is that the jury is presumed to follow the trial court's instructions.").

## VI.  Cumulative Error.

In Point VI, defendant argues that even if each of the errors he challenges did not alone violate his fundamental constitutional rights, in the aggregate, these errors denied him a fair trial. Although any single trial error may not

warrant a reversal, the cumulative effect of several errors may operate to deny defendant a fair trial. State v. Jenewicz, 193 N.J. 440, 473 (2008). When a defendant raises a claim of cumulative error, the court must assess whether the defendant received a fair trial by considering the impact of the trial errors on defendant's ability to present a defense. Ibid.; see also State v. Wakefield, 190 N.J. 397, 538 (2007) (holding that "the predicate for relief for cumulative error must be that the probable effect of the cumulative error was to render the underlying trial unfair").

As discussed in Points I through V, the court did not err in admitting the testimony of Agrawal. Further, the prosecutor's remarks in summation did not unfairly prejudice defendant. The admission of the CSAAS testimony was harmless error because defendant conceded that Jenny had been sexually abused. Although the court should have advised defendant of his sentence exposure under the superseding indictment, that error was not fatal to the trial.

### VII. Reduction of sentence from 160 years to eighty years.

Defendant's argument in Point VII repeats his argument on Point I, but requests different relief. He claims that the trial court violated his right to due process by imposing a sentence twice as long as the maximum sentence he was informed he could receive at the initial plea cutoff hearing.

On counts one, seven, thirteen, nineteen, twenty-five, thirty-one and thirty-seven, which charged defendant with first-degree aggravated sexual assault of a child less than thirteen years old, the court sentenced defendant to consecutive terms of twenty years in prison subject to an eighty-five percent parole disqualifier. According to statute:

> a. Except as otherwise provided, a person who has been convicted of a crime may be sentenced to imprisonment, as follows:
>
> (1) In the case of a crime of the first degree, for a specific term of years which shall be fixed by the court and shall be between 10 years and 20 years.
>
> [N.J.S.A. 2C:43-6(a)(1).][6]

The court also sentenced defendant to a consecutive term of twenty years on count forty-three, the first-degree crime of videotaping the illegal sexual activity.

Defendant accurately argues that he was not properly advised of his

---

[6] On May 15, 2014, the Jessica Lunsford Act, L. 2014, c. 7, § 1, was enacted, amending N.J.S.A. 2C:14-2(a)(1) to require defendants convicted under that statute to receive a sentence of between twenty-five years and life, of which twenty-five years must be served prior to being eligible for parole. The amendment occurred subsequent to the dates of defendant's crimes but prior to his sentencing. The court's sentence of twenty years was therefore permissible because the Legislature cannot increase the punishment for a crime after it has been committed. State v. Hester, 233 N.J. 381, 386 (2018).

maximum sentencing exposure. Instead, he was advised that he could be facing a maximum of eighty years with sixty-eight years total of parole ineligibility, when in fact he received eight consecutive twenty-year sentences with 119 years of parole ineligibility.

In cases where a defendant has accepted an illegal plea agreement, courts have remanded the matter to permit the defendant to accept an increased base term, negotiate a new recommendation or withdraw the guilty plea. State v. Colon, 374 N.J. Super. 199, 223 (App. Div. 2005); State v. Smith, 372 N.J. Super. 539, 543 (App. Div. 2004). But here, defendant did not accept a plea agreement. We agree, however, that defendant should not receive a longer sentence than he was informed he might receive.

## VIII. Excessiveness of Sentence.

In Point VIII, defendant argues that his sentence is excessive and unduly punitive. He argues that he was sentenced to eight consecutive terms as the result of the "arbitrary design of the indictment, which separated the counts based on calendar" years. He contends that such a sentence "should shock the judicial conscience" for its severity. Further, he asserts that the court erred in its finding of aggravating factors, particularly with regard to its consideration of his risk of recidivism and of his perceived lack of remorse.

"In sentencing, trial judges are given wide discretion so long as the sentence imposed is within the statutory framework." State v. Dalziel, 182 N.J. 494, 500 (2005). The standard of review "is one of great deference and '[j]udges who exercise discretion and comply with the principles of sentencing remain free from the fear of "second guessing."'" Id. at 501 (alteration in original) (quoting State v. Megargel, 143 N.J. 484, 494 (1996)).

When reviewing a sentence, we may determine whether "(1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found . . . were not based upon competent and credible evidence in the record; and (3) 'the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable.'" State v. Fuentes, 217 N.J. 57, 70 (2014) (second alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

The sexual assault counts in defendant's initial eight-count indictment were separated by whether the penetration occurred was vaginal, anal or oral. The form of this indictment was legally permissible and adequately informed defendant of the charges against him. See State v. Salter, 425 N.J. Super. 504, 514-15 (App. Div. 2012) (holding that the charging document need not specify the date of abuse so long as it otherwise gives defendant sufficient notice of the

crime to prepare a defense); Cannel, N.J. Criminal Code Annotated, cmt. 4 on N.J.S.A. 2C:14-2 (2020) (observing that "[t]he definitions of penetration and contact in 2C:14-1 indicate that these are to be viewed as generally distinct forms of touching"); State v. D.R., 214 N.J. Super. 278, 298-99 (App. Div. 1986) (noting that "[s]eparate sexual acts, although encompassed in a single episode, may each be the basis for a separate conviction"); State v. Fraction, 206 N.J. Super. 532, 536 (App. Div. 1985) (holding that two different acts of penetration occurring during the same criminal episode represented distinct insults to the victim's dignity and defendant could be punished separately for each).

Later, when Jenny claimed that the sexual abuse began when she was in kindergarten, the State obtained a superseding indictment containing forty-four counts. The last two counts, which were based on defendant's alleged videotaping of sex acts between himself and Jenny, were identical to the last two counts in the first indictment. Counts one through forty-two, however, charged three sexually distinct forms of penetration supporting counts of aggravated sexual assault and child endangerment for each of seven annual periods, starting on July 1, 2005, and ending on August 31, 2011. The State did not explain why it chose to depart from the format employed in the first indictment.

Although defendant objected to the delay associated with obtaining a

superseding indictment, he never objected to the form or substantive content of that indictment. All defenses and objections based on defects in the indictment, barring certain exceptions inapplicable here, must be raised by motion before trial. R. 3:10-2(c). "Failure to so present any such defense constitutes a waiver thereof, but the court for good cause shown may grant relief from the waiver." Ibid. Defendant fails to show good cause to challenge the form of the indictment for the first time on appeal, and we do not consider that issue.

Nevertheless, the question remains that even if the convictions under the indictment were sustainable, did the court abuse its discretion by imposing eight consecutive maximum-term sentences. In State v. Yarbough, 100 N.J. 627, 643-44 (1985), the Supreme Court set forth general guidelines to aid a court in determining whether consecutive sentencing is appropriate. According to Yarbough, the sentencing court should consider facts relating to the crimes, including whether or not

> (a) the crimes and their objectives were predominantly independent of each other;
>
> (b) the crimes involved separate acts of violence or threats of violence;
>
> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

40

(d) any of the crimes involved multiple victims;
[and]

(e) the convictions for which the sentences are to be imposed are numerous.

[Id. at 644.]

Yarbough also held that "successive terms for the same offense should not ordinarily be equal to the punishment for the first offense." Ibid. Although Yarbough recommended an outer limit on the imposition of consecutive sentences, that portion of the decision was superseded by statute. See N.J.S.A. 2C:44-5(a)(2) (providing that "[t]here shall be no overall outer limit on the cumulation of consecutive sentences for multiple offenses").

Here, the court performed a Yarbough analysis, finding that factors (b), (c) and (e) applied, but not (a) and (d). It did not explain why the successive terms for aggravated sexual assault were equal in severity to the first term for aggravated sexual assault. It concluded "sufficient extraordinary facts [were] present" to justify the consecutive sentences, and that the sentence did not shock the judicial conscience. Defendant concedes that he is eligible for consecutive sentences under Yarbough, but argues that eight consecutive sentences are excessive.

"The goal of the Code to be served when sentencing a defendant . . . is to

make the punishment fit the crime. . . . We still adhere to the view that '[t]he focus should be on the fairness of the overall sentence . . . .'" Pennington, 154 N.J. at 361 (third alteration in original) (quoting State v. Miller, 108 N.J. 112, 122 (1987)). "Although the Legislature has by L. 1993, c. 223 superseded Yarbough to the extent that it recommended an overall outer limit on the cumulation of consecutive sentences for multiple offenses, it has not superseded the requirement for principled sentencing." Id. at 361-62 (citation omitted). If consecutive sentences are imposed for the same offense, the sentencing court must "explain why a shorter second term for the same offense is not warranted." Id. at 362; see also State v. Moore, 113 N.J. 239, 309-10 (1988) (holding that although Yarbough did not bar imposition of consecutive sentences for murder, "a more realistic sentence would be one that ensured that [the defendant] would be ineligible for parole for the remainder of her life").

"[T]he Code's general purposes governing sentencing still include the 'safeguard[ing of] offenders against excessive, disproportionate or arbitrary punishment,' N.J.S.A. 2C:1-2(b)(4), and the Yarbough guidelines must be considered in that context." State v. Candelaria, 311 N.J. Super. 437, 454 (App. Div. 1998) (second alteration in original). Even though the sentence on each count of a multi-count indictment may be justified, the aggregate sentence may

be so severe as to shock the judicial conscience. Ibid.

Defendant was sixty-two years old at the time of sentencing and had 1489 days of jail credit. Imposing consecutive terms amounting to 160 years in prison, with 119 years without parole, is excessive and arbitrary. No purpose was served by sentencing defendant to a term that far exceeds his natural lifetime. While the court elaborated on the number and severity of the offenses, it did not explain why it imposed the maximum possible sentence for each count of aggravated sexual assault by vaginal penetration. We remand for resentencing so that the trial court may consider the fairness of the overall term in light of Yarbough and its progeny.

The court found the presence of aggravating factor three, N.J.S.A. 2C:44-1(a)(3), the risk that defendant would re-offend; aggravating factor four, N.J.S.A. 2C:44-1(a)(4), defendant took advantage of a position of trust to commit the offense; and aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), the need for general and specific deterrence. It found no mitigating factors and concluded that the aggravating factors "preponderate."

A court must state on the record its findings on the applicability of the aggravating and mitigating factors, and the underlying factual basis for those findings. N.J.S.A. 2C:43-2(e); R. 3:21-4(g). It must explain the balancing

process it employed and indicate the factors it considered, how it weighed them and how it determined the sentence. State v. Kruse, 105 N.J. 354, 359-60 (1987). "Merely enumerating the [statutory] factors does not provide any insight into the sentencing decision." Id. at 363.

Defendant takes exception to the court's reference to his lack of remorse as a factor in supporting its finding of aggravating factor three. When finding aggravating factor three, the court relied upon defendant's record of seven arrests and two convictions. It then added:

> And if, per chance, the Appellate Division does not find that the reason I just gave was reasonable, try this: Defendant does not express remorse and defendant does not accept responsibility. Because reasonable minds may differ about the risk, but I don't think any reasonable mind could differ that Mr. Calderon does not express remorse to the victim or that this even happened.

Contrary to defendant's arguments, a defendant's lack of remorse may at times be cited as support for a trial court's conclusion that the defendant is a risk to re-offend. In State v. Carey, 168 N.J. 413, 427 (2001), a case cited by defendant, the Court found that a defendant's failure to accept responsibility for a drunk driving accident did not irrefutably prove that he was likely to re-offend, but did provide support for the trial court's conclusion as to aggravating factor three. In State v. Marks, 201 N.J. Super. 514, 540 (App. Div. 1985), the court

found that "a defendant's refusal to acknowledge guilt following a conviction is generally not a germane factor in the sentencing decision." However, it concluded that the trial court's "brief allusion to the defendant's failure to candidly admit his guilt [did] not require a reversal." Ibid. In State v. Rivers, 252 N.J. Super. 142, 153-54 (App. Div. 1991), the court stated that the "[d]efendant's consistent denial of involvement and his lack of remorse indicate that a prison sentence is necessary to deter defendant from similar conduct in the future."

Here, the court cited defendant's criminal history to support its finding of aggravating factor three. Defendant does not claim that the criminal history was inaccurate. The court's comments about defendant's lack of remorse were made as a superfluous aside to us and not as the sole support for its finding. For that reason, the court's articulation of this concern does not provide a sufficient basis to vacate defendant's sentence.

Defendant argues with regard to aggravating factors three and nine that the court failed to consider that his risk of recidivism is low. He contends that he is unlikely to commit another sex offense because his Adult Diagnostic and Treatment Center evaluation showed that he was neither repetitive nor compulsive, and because he will be compelled to register as a sex offender when

released from prison. These contentions were not raised prior to sentencing, and the court did not consider them when making findings under aggravating factors three and nine.

Defendant does not explain how his situation differs from any other defendant convicted of a sex crime who is ordered to register as a sex offender pursuant to Megan's Law, N.J.S.A. 2C:7-2(b)(1). The fact that defendant served time in prison and on parole and yet re-offended supports the findings that he is at risk of committing another offense and must be deterred from violating the law. The court did not abuse its discretion by failing to sua sponte consider defendant's low risk of recidivism, nor by finding that defendant presented a risk of re-offending based on his criminal record.

Finally, defendant argues that the court erred by double-counting his position of trust with regard to Jenny to support a finding of aggravating factor four as to the endangering counts. In finding aggravating factor four, the court observed that defendant was involved in Jenny's care and assumed a father-like position in her life. "[H]e took advantage of his position of trust and confidence to commit the sexual offenses against her."

Defendant unquestionably maintained a position of trust with Jenny and took advantage of that relationship to commit the aggravated sexual assaults.

46

The existence of a position of trust is not an element of N.J.S.A. 2C:14-2(a), N.J.S.A. 2C:24-4(b)(3), or N.J.S.A. 2C:24-4(b)(4).  Thus, the court's finding of aggravating factor four as to those counts was appropriate.

The endangering the welfare of a child counts under N.J.S.A. 2C:24-4(a)(1), however, pertain specifically to "[a]ny person having a legal duty for the care of a child or who has assumed responsibility for the care of a child." Using defendant's position of trust to satisfy the elements of N.J.S.A. 2C:24-4(a) and to support a finding of aggravating factor four constitutes impermissible double-counting.   See State v. Kromphold, 162 N.J. 345, 353-54 (2000) (explaining that evidence of an element of the offense may not be used to support a sentencing aggravating factor).  To the extent the court applied aggravating factor four to the second-degree convictions for endangering the welfare of a child, it erred.

We remand for resentencing to a term no greater than the length of the term defendant was advised he was facing.  We remind the trial court:

> A judge may not permit his or her sense of moral outrage and indignation to overwhelm the legal process. The need for dispassionate, evenhanded conduct is most acute in the sentencing phase of a criminal trial. For it is in this critical phase of the criminal process that the judge's role changes, from an arbitrator of legal disputes that arise in the course of the trial, to the dispenser of society's justice.  In this role, the judge

must act in a manner that reassures all affected—defendant and his family, the victims and their families, and society at large—that he or she will be guided exclusively by the factors established by law and not by the judge's personal code of conduct.

[State v Tindell, 417 N.J. Super. 530, 571 (2011).]

Convictions affirmed. Remanded for resentencing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION