# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3299-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JEFFREY HOLLAND, a/k/a
JEFFREY R. HOLLAND,

    Defendant-Appellant.

_____

Submitted January 12, 2022 – Decided February 14, 2022

Before Judges Hoffman, Whipple and Geiger.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment Nos: 16-07-2123 and 16-07-2129.

Joseph E. Krakora, Public Defender, attorney for appellant (Daniel S. Rockoff, Assistant Deputy Public Defender, of counsel and on the brief).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent (Frank J. Ducoat, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Jeffrey Holland appeals his conviction for three first-degree murders and related charges, and his sentence, which included multiple consecutive terms, yielding an aggregate sentence of 180 years with 158 years of parole ineligibility. He also appeals from an order that denied his motion to sever counts eight through fourteen of Indictment No. 16-07-2123. We affirm defendant's conviction but remand for resentencing of certain counts.

Defendant was accused of the murders of Tiniquah Rouse, Ashley Jones, and Jarrell Marshall. Investigators believed the murders were connected because both Rouse and Jones were previously sexually involved with defendant, and Marshall was Jones's new boyfriend. In addition, investigators believed that surveillance footage recovered at both crime scenes showed defendant wearing similar clothing.

I.

On January 29, 2016, Rouse was murdered in her apartment in Newark. Harold McSwain, a neighbor, saw Rouse's door was open, noticed water was running, found her body in the bathtub, and called 911.

Upon their arrival, police found Rouse's naked, slightly contorted body on the floor. The bathroom floor and hallway were covered in water, and the tub

A-3299-18

was partially filled. A hair curling iron was inserted in Rouse's vagina and anus. Detective Christopher Brown found Rouse's infant son in the bedroom closet underneath some clothes.

Rouse did not have a pulse when EMS arrived and was pronounced dead at the hospital at approximately 12:18 a.m. An autopsy determined the cause of death as compression to the neck and drowning. No viable fingerprints of the perpetrator were discovered in the apartment.

Defendant testified on his own behalf about his version of the events. He explained that he and Rouse had a "sexual relationship" but did not consider each other boyfriend and girlfriend. He also had a sexual relationship with Saleemah Anderson, Rouse's roommate and cousin. On the day of the incident, defendant was bored and "wanted to have a good time." He texted Anderson and went to Rouse's apartment, arriving at approximately 5:00 p.m. Anderson was not home. The two engaged in sexual activity "the way [they] normally do" in Rouse's bedroom. According to defendant, Rouse "likes to be choked and tied up and spit on and stuff of that sort." The two engaged in sexual activity again, at which time defendant choked Rouse. Defendant testified that he found a brown wire and asked if Rouse wanted him to use it, and she agreed. The

judge sustained objections from the prosecutor about anything Rouse said that night. Defendant further testified:

> I choked her. I proceeded to choke her harder at her request. In the process of having sex, . . . she's like making like this arching like movement. And it didn't really cause me like no concern because I just figured she was having an orgasm and it wasn't unusual for her to move in that manner when she [would] have orgasms. So after I ejaculated and . . . got [up] from on top of her, I noticed . . . she wasn't moving. She still didn't get up. She wasn't saying anything. And I kind of heard this gurgling noise . . . . That's when I became concerned. I went to her, I tried to get the restraints off her hand, I couldn't. I ran to the kitchen, grabbed a knife out the sink and cut it off.

Defendant stated he then took Rouse to the bathroom and tried to resuscitate her. He testified that he "completely panicked" and wiped down everything in the apartment that he had touched. Defendant also took everything off the bed and put it into a suitcase, including the used sheets, blankets, and sex toys. He tried washing out her vagina with soap from the bathroom, and then found a curling iron under her sink. He inserted one part of it into her vagina and the other into her anus and turned the iron on to destroy his DNA.

Defendant then wrapped the baby, who had previously been on the bed, in a blanket and placed him inside of the bedroom closet. He stated that he turned the water on in the bathtub so that it would flood the apartment and alert

4

someone to come find the baby. Defendant left the apartment unlocked and discarded the suitcase in a dumpster. He then returned to the apartment because he realized he left a bottle of soda there, which may have had his DNA on it. After that, he returned home at around 11:00 p.m., where he lives with his father and brother. Defendant admitted that it was him in the surveillance video going in and out of Rouse's apartment with the suitcase, wearing a black Northface jacket, jeans, and gray shoes.

Officers recovered the suitcase, which contained an air mattress pump, lotion, a sex toy, clothing, and a receipt, which were all Rouse's belongings. Police also found electrical cords, one with a long hair in it, and a serrated steak knife in the suitcase. Police could not find Rouse's phone, but cell tower records showed it was near defendant's home in East Orange on January 29 after Rouse was already dead.

Defendant claimed he woke up around 9:00 a.m. the following day and left his home wearing red sneakers, a red sweatshirt, green cargo pants, and carrying a blue backpack that contained his Northface jacket. He discarded the jacket in a trash chute in a nearby building. Defendant claims he spent the rest of the day with his brother. That night, he returned to Rouse's apartment building to see if there was a police presence.

The trial court found that the video surveillance footage recovered from the interior and exterior of the building revealed:

- 5:08 p.m. An individual with long dreadlocks, ripped jeans with the left black pocket sticking out of the rip of the left jean legs, rips on the right jean leg, a black Northface jacket, a hat, and a mask over his mouth, walked to [Rouse's apartment building].

- 5:12 p.m. An unknown person lets the individual into the building and the individual is seen walking to the stairwell.

- 5:13 p.m. The individual is now seen on the fourth floor of the building. The individual walks to and then waits outside [Rouse's apartment].

- 5:16 p.m. The individual is let in. No one is seen entering or exiting [Rouse's apartment] until almost [seven] hours later.

- 11:00 p.m. The individual that entered earlier now leaves wearing the same clothes. However, this time, the individual has a red glove on his left hand holding a suitcase and a white cloth in his right hand. The individual is then observed pulling the suitcase and proceeding down the stairwell and into the vestibule area in front of entrance of [the building]. The individual then exits the apartment building with the suitcase.

- 11:14 p.m. The individual returns to the apartment building . . . wearing the same clothes.

- 11:15 p.m. While inside the vestibule, the individual pulls up his mouth mask and goes to the stairs and up to the fourth floor. As he walks past the fourth floor camera, he is observed with the same clothes, but the mask is now on and he is putting on red gloves. He then enters [Rouse's apartment] without delay.

6

- 11:18 p.m. The individual is still wearing the same clothes, but he is now holding a green bottle and his dreadlocks are tucked into his Northface jacket.

- 11:19 p.m. The individual leaves [the apartment] and exits the apartment building.

- 11:42 p.m. McSwain, riding his bike, arrives at [the building].

- 11:44 p.m. McSwain walks down the fourth-floor hallway and enters [Rouse's apartment].

- 12:09 p.m. McSwain is seen opening [the] building for police and EMS.

- 12:21 p.m. EMS is observed carrying a swaddled baby out of [the apartment].

Saleemah Anderson knew defendant as "Rodrese," – defendant's middle name. On January 31, Anderson identified defendant on surveillance footage. She also identified him in the courtroom. Anderson identified the suitcase as Rouse's.

Defendant was previously in a sexual relationship with Jones. They have two children together. They previously lived together, until she received housing assistance and moved.

During the evening of January 30, 2016, police reported to Jones's apartment in response to a report of a shooting. A neighbor called 911 after hearing gunshots coming from the apartment. Jones and Marshall were found

dead in the apartment. Police found three children in the apartment crying in the bedroom where Jones and Marshall lay dead. Jones was holding one of the children. Two of the children were defendant's biological children, the other was Marshall's child with another woman.

The door to the apartment was kicked in and nearly off its hinges. Seven shell casings were found near Marshall, and there were bullet holes in the window and near where Jones lay. Autopsies revealed that Jones had two gunshot wounds to the head, and Marshall had multiple gunshot wounds to the neck, torso, arms, and legs. The medical examiner found Jones's cause of death was the gunshot wound to the head and Marshall's was multiple gunshot wounds. No fingerprints of the perpetrator were found at the scene.

Surveillance footage recovered from the building revealed:

- 8:14 p.m. An individual wearing green cargo pants, a red sweatshirt with white strings and the hood over his head, a black Northface jacket, red sneakers, and a red glove is observed going up the stairwell at the apartment building.

- 8:20 p.m. The individual, wearing the same clothes, is observed going down the stairwell.

Seven gunshots and a woman's scream can be heard on another surveillance video. Jones and Marshall were fatally shot within minutes of each other. An individual is then seen running away from the building.

8

After receiving Miranda[1] warnings and waiving those rights, defendant was interviewed by detectives on January 31, 2016, at about 4:30 a.m. He consented to detectives searching his cellphone. Defendant was held on several unrelated arrest warrants.

The two incidents were initially investigated separately, but as the investigations progressed, defendant became a suspect in all three murders. Detective Anthony Lima noticed that the suspects in the three murders were wearing similar clothing, their descriptions matched, and the suspect in the surveillance videos resembled defendant. Investigators obtained search warrants for defendant's residence, the clothing he wore on January 31, 2016, and his person.

During the search of defendant's residence, detectives seized green cargo pants, a black ski mask in the pants pocket, and red gloves. They also found defendant's sneakers, his driver's license, documents belonging to Jones, a gun holster, two handgun magazines, and nineteen live rounds of ammunition. Defendant did not have a permit to carry a gun. They also recovered a key to the front door of Jones's apartment and one of defendant's cellphones, which showed text messages from Jones asking defendant to leave her alone. The text

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

messages include defendant stating, "I could have killed you three times" to Jones, and that the only reason he did not kill Marshall was because he left his gun at his house. He also texted her saying he would kick her door in, which is exactly how officers found the door the night of the shooting. Defendant testified that he was out of state when he sent that message and did not mean it, he was "just harassing."

Investigators also recovered Facebook messages that defendant sent to Dominique Street describing sexual acts Jones performed on him, along with the message, "Nah dis b**ch just dirty. [I'm] just waiting on my moment to kill this b**ch." He sent similarly vulgar messages to Jones' entire friend list on Facebook. Detectives examined defendant's internet search history on his phone and found that just hours before Rouse was killed, defendant searched "New Jersey law on Murder" multiple times. On January 27, defendant searched where to buy 0.40 caliber ammunition. Jones and Marshall were killed with 0.40 caliber ammunition.

He sent similar messages to one of Jones's friends, writing that he was waiting for the go ahead to "kill him" (meaning Marshall), that the children would be "better without" Jones and that he was "seriously thinking about paying Dominque a visit." He also wrote: "the way I move I rather just eliminate

10

both of them out of the picture"; "b\*\*ch I'm senseless."  "Just be patient and watch my work."  He also stated that Jones was terrified of him "because she know[s] I'm ruthless."

On January 31, 2016, defendant emailed his father prior to speaking to detectives, stating, "Dad I love [you with] all my heart if [you don't] hear from me by tomorrow evening[,] I got locked up . . . ."

An Essex County grand jury returned three indictments against defendant. Indictment No. 16-07-2123 charged defendant with first-degree murder of Rouse, N.J.S.A. 2C:11-3(a)(1)-(2) (count one); two counts of third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (counts two and thirteen); second-degree desecration of human remains, N.J.S.A. 2C:22-l(a)(2) (count three); second-degree desecration of human remains, N.J.S.A. 2C:22-l(a)(3) (count four); two counts of third-degree hindering apprehension or prosecution, N.J.S.A. 2C:29-3(b)(l) (counts five and six); third-degree theft by unlawful taking, N.J.S.A. 2C:20-3(a) (count seven); first-degree murder of Jones, N.J.S.A. 2C:11-3(a)(1)-(2) (count eight); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-5(b) (count nine); two counts of second-degree unlawful possession of a weapon N.J.S.A. 2C:39-4(a) (counts ten and twelve); first-degree murder of Marshall, N.J.S.A. 2C:11-3(a)(1)-(2)

(count eleven); two counts of second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a) (counts fourteen and fifteen); second-degree burglary, N.J.S.A. 2C:18-2 (count sixteen); and first-degree felony murder, N.J.S.A. 2C:11-3(a)(3) (count seventeen).

Indictment No. 16-07-2129 charged defendant with second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b) (count one). Indictment No. 16-07-2128, which charged defendant with fourth-degree contempt of a domestic violence restraining order, N.J.S.A. 2C:29-9(b), was dismissed by the State following the verdict on the other indictments.

Defendant moved to sever counts eight to seventeen, contending that joinder of the counts relating to the first and second incidents would be prejudicial. The State argued that while the two incidents were different events that happened at different times and locations, they eventually "became one case," with the identity of Rouse's killer leading directly to the identity of Jones's and Marshall's killer.

In his oral decision, the judge performed a <u>Cofield</u>[2] analysis and summarized the essential facts of both incidents that made them similar. He noted the following physical evidence shared between the incidents: defendant's

---

[2] <u>State v. Cofield</u>, 127 N.J. 328 (1992).

distinctive dreadlocks, ripped jeans, Northface jacket, black face mask, red gloves, hat, green cargo pants, and red sweatshirt. After outlining the evidence, the court found that the two incidents were "so intertwined together that it would be next to impossible to separate" them. The court also found that the possible prejudice to defendant was outweighed by "the enormous probative value[.]"

In a written decision, the judge recounted the pertinent facts and applied the applicable legal principles. Under the first prong of Cofield, whether the evidence of another crime is relevant to a material issue which is genuinely disputed, the court found that defendant's identity as the killer in both instances was genuinely in dispute because defendant originally denied involvement in either homicide. The evidence of identity proffered by the State showed that killer of all three victims was wearing similar items of clothing outside their homes. Some of that clothing was found in defendant's apartment. This evidence would be used to prove his identity as the killer in both incidents.

Under the second Cofield prong, that the other bad acts evidence be "similar in kind and reasonably close in time to the offense charged," the judge found that the two incidents involved homicides and similar related offenses that occurred within forty-eight hours of one another. Although the methods of killing were different, the crimes were otherwise sufficiently similar.

13

Under the third Cofield prong, whether the evidence of the misconduct is clear and convincing, the judge found there was "substantial evidence connecting [d]efendant" to all three homicides, noting:

> The surveillance video on January 29, 2016 from [the apartment building] where Rouse was killed, shows the suspect who has long black dreadlocks, ripped jeans with the left pock[et] sticking out of the rip of the left jean leg with rips on the right leg, a black half-mask, and red gloves. Defendant is shown on surveillance video at [his residence] and is shown via photographs taken of him at University Hospital and surveillance video of him at the Essex County Prosecutor's Office to have long black dreadlocks. Defendant is shown via photographs taken of him at University Hospital and surveillance video of him at the Essex County Prosecutor's Office to have ripped jeans with the left pock[et] sticking out out of the rip of the left jean leg with rips on the right leg. Furthermore, a search of [d]efendant's apartment . . . revealed a pair of green cargo pants that contained a black half-mask and red gloves.

> The surveillance video on January 30, 2016 from [Jones's apartment building], where Jones and Marshall were killed, shows the suspect who has red gloves, green cargo pants, a red sweatshirt with white strings, and red sneakers. Defendant is seen on surveillance footage that same day, two hours after the Jones-Marshall homicide, entering his apartment . . . wearing green cargo pants, a red sweatshirt with white strings, and red sneakers. Furthermore, a search of [d]efendant's apartment . . . revealed a pair of green cargo pants that contained red gloves.

14

Under the fourth <u>Cofield</u> prong, whether the probative value of the evidence outweighs the prejudice to defendant, the judge found the highly probative value of the evidence of the two homicides outweighed any prejudicial effect if the offenses relating to the two incidents were tired together. He noted the female victims had prior intimate relationships with defendant. In addition:

> The two homicides took place within less than twenty-four hours of each other. The victims were pronounced dead by the same doctor and autopsied by the same medical examiner. The suspect was wearing similar clothes, which [d]efendant either was later also wearing at some point or was found to be in possession of. The investigations began within less than 24 hours of each other and rapidly became intertwined due to the similarities of the cases.

The judge further noted that while the murders were independent of each other, they were part of a chain of events

> that unfolded in a very short and rapid time span. Trying the murders together does not establish [d]efendant's propensity to commit crime nor would it have "a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation' of the issues in the case." Thus, the probative value of the evidence is not outweighed by any prejudicial effect and the fourth <u>Cofield</u> factor is satisfied.
>
> [(Citations omitted).]

Based on these findings, the court concluded that "[e]vidence from both homicides . . . would be admissible if the two homicides were tried

15

independently." Therefore, "it would be improper to sever the two cases." Accordingly, defendant's severance motion was denied.

The case proceeded to trial. The prosecutor repeatedly referred to defendant as the person who killed Rouse, Jones, and Marshall. In his opening statement, the prosecutor explained that evidence would show that defendant was the person on the surveillance video entering Jones's apartment, even though the identity of that individual was in dispute. When reviewing surveillance footage, Lima and the prosecutor repeatedly used defendant's name when identifying who was at Jones's apartment. Defendant did not object to the prosecutor's opening statement or to Lima's testimony. Instead, defense counsel argued that there was no one who was inside of the apartment that can say they saw defendant kill Marshall or Jones and there was no "viable evidence that shows that [defendant] was even there."

Without objection, FBI Special Agent John Hauger was admitted as the State's expert in historical cell site analysis. He analyzed two of defendant's cell phones.

Hauger testified that defendant's cellphones were near the crime scenes at the time of each murder, first at Rouse's apartment, then at the dumpster, then moving back to his residence in East Orange, and then at Jones's apartment.

16

Hauger candidly acknowledged that he could not "tell you the exact spot a phone was historically." He also acknowledged that he did not do a drive test, which involves driving a cellphone up and down a street to see which tower it pings off and how far the tower's reach extends. He explained, however, that the cellphone chooses which tower to ping to, not the tower.

The jury found defendant guilty of all counts of Indictment Nos. 16-07-2123 and the certain persons offense charged in Indictment No. 16-07-2129.

Defendant was sentenced on February 26, 2019. The judge asked defendant if he wanted to allocute, but defendant declined. The judge described defendant as "a total menace to society." It explained the brutality of the murders, and the fact that defendant "show[ed] absolutely no remorse whatsoever." In sentencing defendant, the judge indicated that he wanted to ensure the safety of public and that defendant would "not hurt anyone else again by his sentence today."

The judge declined to find aggravating factor one, N.J.S.A. 2C:44-1(a)(1), even though he found defendant's conduct was "heinous, cruel, and depraved." On both indictments, the judge found aggravating factors three (the risk defendant will reoffend), N.J.S.A. 2C:44-1(a)(3); six (the extent of defendant's criminal record and the seriousness of the offenses committed), N.J.S.A. 2C:44-1(a)(6); nine (the need for deterrence), N.J.S.A. 2C:44-1(a)(9); and fourteen (the

offense involved an act of domestic violence), N.J.S.A. 2C:44-1(a)(14). The court found no mitigating factors and was clearly convinced the aggravating factors substantially outweighed the non-existent mitigating factors.

The judge explained that although there is a presumption of concurrent sentences, under State v. Yarbough, 100 N.J. 627 (1985), and subsequent case law, the presumption can be overridden if "the crimes and their objectives were predominantly independent of one another, the crimes involve separate acts of violence or threats of violence, the crimes were committed at different times or separate places, [and consider] whether or not the crimes involve multiple victims." The judge found that because the murders were separate acts of violence, occurred on consecutive but separate dates, and there were three separate victims, the murder sentences should run consecutive to each other.

For each of the three murders (counts one, eight, and eleven), defendant received a sixty-year term, subject to the parole ineligibility and mandatory parole supervision imposed by the No Early Release Act, N.J.S.A. 2C:43-7.2, with counts eight and eleven running consecutively to each other and to count one. Defendant received five-year concurrent terms on counts two, five, and thirteen. On counts four, fourteen, and sixteen, he received concurrent ten-year terms. On count nine, he received a ten-year term, subject to a five-year period

of parole ineligibility.  On count fifteen, defendant received a ten-year NERA term.  Counts three, six, seven, ten, twelve, and seventeen were merged for sentencing purposes.  On the certain persons count (Indictment No. 16-07-2129), defendant was sentenced to a consecutive ten-year term, subject to a five-year period of parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6(c).  This yielded an aggregate sentence of 190 years with 158 years of parole ineligibility.  This appeal followed.

Defendant raises the following points for our consideration.

POINT I

THE TRIAL COURT ERRED BY DENYING DEFENDANT'S MOTION TO SEVER COUNTS 1-7 FROM COUNTS 8-17 OF INDICTMENT NO. 16-07-2123.

POINT II

THE IMPROPER ADMISSION OF A DETECTIVE'S LAY OPINION, IDENTIFYING THE DEFENDANT AS THE SUSPECT ON THE SURVEILLANCE VIDEOS, WAS PLAIN ERROR, REQUIRING REVERSAL OF DEFENDANT'S CONVICTIONS.

POINT III

BECAUSE THE STATE FAILED TO DEMONSTRATE THAT ITS EXPERT'S METHODOLOGY WAS SCIENTIFICALLY RELIABLE, THE COURT ERRED BY ALLOWING AN FBI AGENT TO OPINE AS AN EXPERT THAT

19

CELL PHONE SERVICE RECORDS WERE CONSISTENT WITH THE DEFENDANT BEING AT THE HOMICIDE SCENE.

POINT IV

THE SENTENCING COURT VIOLATED THE DEFENDANT'S FIFTH AMENDMENT RIGHT TO SILENCE AND SIXTH AMENDMENT RIGHT TO COUNSEL BY FINDING AS AN AGGRAVATING FACTOR THAT HE DID NOT SPEAK TO EXPRESS REMORSE. THE COURT ALSO MISAPPLIED THE YARBOUGH FACTORS ON COUNTS 8 AND 11.

II.

We first address the denial of defendant's motion to sever counts one to seven from counts eight to fourteen. "A trial court's severance decision will be reversed only for an abuse of discretion." State v. Davis, 390 N.J. Super. 573, 591 (App. Div. 2007) (citing State v. Chenique-Puey, 145 N.J. 334, 341 (1996)).

We are guided by the following basic principles governing joinder of offenses. Rule 3:7-6 provides:

> Two or more offenses may be charged in the same indictment or accusation in a separate count for each offense if the offenses charged are of the same or similar character or are based on the same act or transaction or on [two] or more acts or transactions connected together or constituting parts of a common scheme or plan. Relief from prejudicial joinder shall be afforded as provided by [Rule] 3:15-2.

"Although joinder is favored, economy and efficiency interests do not override a defendant's right to a fair trial." State v. Sterling, 215 N.J. 65, 72 (2013). Rule 3:7-6 provides a remedy for prejudicial joinder, "referencing Rule 3:15-2(b), which vests a court with discretion to sever charges '[i]f for any other reason it appears that a defendant or the State is prejudiced by a permissible or mandatory joinder of offenses or of defendants in an indictment or accusation.'" Id. at 73. The Court explained:

> The relief afforded by Rule 3:15-2(b) addresses the inherent "danger[,]when several crimes are tried together, that the jury may use the evidence cumulatively; that is, that, although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all." State v. Pitts, 116 N.J. 580, 601 (1989) (quoting United States v. Lotsch, 102 F.2d 35, 36 (2d Cir. 1939)).
>
> [Ibid. (alteration in original).]

In determining whether to grant severance, a trial court must assess whether joinder would prejudice the defendant or the State. Ibid. "The test for assessing prejudice is 'whether, assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible under [N.J.R.E. 404(b)] in the trial of the remaining charges.'" Ibid. (alteration in original) (quoting Chenique-Puey, 145 N.J. at 341). "The admissibility of the

A-3299-18

evidence in both trials renders inconsequential the need for severance."  Davis, 390 N.J. Super. at 591 (citing State v. Coruzzi, 189 N.J. Super. 273, 299 (App. Div. 1983)).

Rule 404(b)(1) prohibits the use of other crimes, wrongs or acts "to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition."  However, such "evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute."  N.J.R.E. 404(b)(2).

The requirements of N.J.R.E. 404(b) must be met.  Sterling, 215 N.J. at 73 (citing Cofield, 127 N.J. at 338).  In Cofield, the Court adopted the following four-part test to determine admissibility: (1) "[t]he evidence of the other crime must be admissible as relevant to a material issue"; (2) "[i]t must be similar in kind and reasonably close in time to the offense charged"; (3) "[t]he evidence must be clear and convincing; and" (4) "[t]he probative value of the evidence must not be outweighed by its apparent prejudice."  127 N.J. at 338.  In addition, "such evidence is admissible only if it is relevant to prove a fact genuinely in dispute 'and the evidence is necessary as proof of the disputed issue.'" State v.

Darby, 174 N.J. 509, 518 (2002) (quoting State v. Hernandez, 170 N.J. 106, 118-19 (2001)).

Applying these principles to this case, we conclude that the denial of defendant's severance motion was not an abuse of discretion. The trial court provided cogent and thorough reasoning for denying defendant's motion to sever counts eight to fourteen. The court considered each prong of the four-part test separately, setting forth the pertinent facts in its analysis. We discern no abuse of discretion.

Under the first prong, a material issue in the Jones and Marshall murders was the identity of the suspect in the surveillance footage, and whether that suspect was defendant. Under the second prong, all three murders occurred within forty-eight hours, and the first and second victims were defendant's former girlfriends. The male victim was the current boyfriend of the second victim. Under the third prong, the court found that the evidence of the Rouse murder was clear and convincing; defendant admitted killing to Rouse but claimed he had no intent to kill her. Under the fourth prong, the court found the probative value of the evidence outweighed the prejudice to defendant.

### III.

Defendant contends that the admission of Detective Lima's lay opinion, identifying defendant as the suspect in the surveillance videos was reversible plain error.  We disagree.

An appellate court defers to a trial court's evidentiary ruling absent an abuse of discretion.  State v. Garcia, 245 N.J. 412, 430 (2021).  We do so because "the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion."  State v. Prall, 231 N.J. 567, 580 (2018) (quoting Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010)).  Under that deferential standard, we "review a trial court's evidentiary ruling only for a 'clear error in judgment.'"  State v. Medina, 242 N.J. 397, 412 (2020) (quoting State v. Scott, 229 N.J. 469, 479 (2017)).

Where there is no objection to testimony, we review for plain error.  The admission of the unchallenged evidence constitutes plain error if it was "clearly capable of producing an unjust result."  R. 2:10-2.  "Thus, the error will be disregarded unless a reasonable doubt has been raised whether the jury came to a result that it otherwise might not have reached."  State v. Singh, 245 N.J. 1, 13 (2021) (quoting State v. R.K., 220 N.J. 444, 456 (2015)).

N.J.R.E. 701 permits testimony by lay witnesses "in the form of opinions or inferences" if it is "(a) is rationally based on the witness's perception; and (b) will assist in understanding the witness's testimony or determining a fact in issue." This testimony "must 'assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue.'" State v. Sanchez, 247 N.J. 450, 469 (2021) (quoting Singh, 245 N.J. at 15). A witness should offer an opinion on something that the jury can come to a decision to on their own. Id. at 469-70. The purpose of the rule "is to ensure that lay opinion is based on an adequate foundation." Singh, 245 N.J. at 14 (quoting State. v. Bealor, 187 N.J. 574, 586 (2006)).

Regarding identity, lay witness testimony may be admissible, but courts must consider the nature, duration, and timing of the witnesses' contacts with the defendant. Sanchez, 247 N.J. at 470 (citing U.S. v. Walker, 974 F.3d 193, 205-06 (2d Cir. 2020)). Another factor to consider when permitting an officer to testify about identity at trial is whether there are other witnesses capable of doing so. State v. Lazo, 209 N.J. 9, 23 (2012). Courts will also look to whether the identification is helpful to the jury where surveillance photos are so blurry that the subject's features are unclear, but not so clear that jurors can make the comparison to the defendant themselves. Sanchez, 247 N.J. at 475.

Here, Detective Lima's fleeting reference to defendant did not constitute plain error given the other evidence produced at trial. Unlike in <u>Lazo</u>, the evidence implicating defendant in the murders was not limited to identifying the suspect depicted in surveillance videos. Defendant admitted his involvement in Rouse's death. The evidence included the incendiary text messages defendant sent Jones, his history with her and Marshall, his Facebook messages, his cellphone location near the crime scene, and the fact that the same caliber bullets used on Jones and Marshall were found in his home. Moreover, there were no other witnesses available to testify about presence at Jones's apartment during the incident.

Lima's lay opinion testimony was not "clearly capable of producing an unjust result." <u>R.</u> 2:10-2. Defendant has not demonstrated there is "a reasonable doubt" that "the jury came to a result that it otherwise might not have reached." <u>Singh</u>, 245 N.J. at 13 (quoting <u>R.K.</u>, 220 N.J. at 456).

IV.

We next address the admissibility of the historical cell tower evidence. The State's expert, FBI Special Agent John Hauger, opined that the cell phone service records were consistent with the defendant being at the homicide scene.

A-3299-18

Defendant contends the State failed to demonstrate that the methodology used by its expert was scientifically reliable. We are unpersuaded.

We review a trial court's evidentiary determination that a witness is qualified to present expert testimony under N.J.R.E. 702 for abuse of discretion "and will only [] reverse for manifest error and injustice." State v. Rosales, 202 N.J. 549, 562-63 (2010) (quoting State v. Jenewicz, 193 N.J. 440, 455 (2008)). A trial court's decision to permit expert testimony is accorded deference. Townsend v. Pierre, 221 N.J. 36, 52 (2015). Here, there was no objection to the expert's qualifications or the admission of his testimony. Therefore, the plain error rule applies. R. 2:10-2.

N.J.R.E. 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."

The party offering expert testimony bears the burden of establishing its admissibility. State v. Harvey, 151 N.J. 117, 167 (1997) (citing Windmere, Inc. v. Int'l Ins. Co., 105 N.J. 373, 378 (1987)). We apply the following three-prong test for the admission of expert testimony:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2)

the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.

[Jenewicz, 193 N.J. at 454.]

Special Agent Hauger has more than fifteen years' experience in the field of historical cell tower analysis. He was properly qualified as an expert based on his experience.

In criminal cases, our courts apply the general acceptance test for reliability enunciated in Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923). State v. Cassidy, 235 N.J. 482, 491-92 (2018). Here, only the second prong of the Frye test is at issue. "Scientific test results are admissible in a criminal trial only when the technique is shown to be generally accepted as reliable within the relevant scientific community." Ibid. To establish general acceptance, "the party proffering the evidence need not show infallibility of the technique nor unanimity of its acceptance in the scientific community." Id. at 492. Here, the State must prove that the cell-site analysis methodology "and the interpretation of its results are non-experimental, demonstrable techniques that the relevant scientific community widely, but perhaps not unanimously, accepts as reliable." Harvey, 151 N.J. at 171.

When reviewing a decision on the admission of scientific evidence in a criminal case, "an appellate court should scrutinize the record and independently review the relevant authorities, including judicial opinions and scientific literature." Harvey, 151 N.J. at 167; see also State v. Pickett, 466 N.J. Super. 270, 303 (App. Div. 2021) (an appropriate review in a criminal case requires an appellate court to "independently scrutinize the record, including the comprehensive and amplified declarations of the experts, the scientific validation studies and peer-reviewed publications, and judicial opinions"). "Whether expert testimony is sufficiently reliable to be admissible under N.J.R.E. 702 is a legal question we review de novo." State v. J.L.G., 234 N.J. 265, 301 (2018).

"Cell phones work by communicating with cell-sites operated by cell-phone service providers. Each cell-site operates at a certain location and covers a certain range of distance." In re U.S. for an Order Authorizing the Release of Historical Cell-Site Info., 809 F. Supp. 2d 113, 115 (E.D.N.Y. 2011). "The geographic area covered by a particular tower depends upon 'the number of antennas operating on the cell site, the height of the antennas, topography of the surrounding land, and obstructions (both natural and manmade).'" Holbrook v. Commonwealth, 525 S.W.3d 73, 79 (Ky. 2017) (quoting United States v. Hill,

818 F.3d 289, 295 (7th Cir. 2016)). "When a cell phone user makes a call, the phone generally 'connect[s] to the cell site with the strongest signal,' although 'adjoining cell [towers] provide some overlap in coverage." Ibid. (alterations in original) (quoting Hill, 818 F.3d at 295). Other factors affecting which tower a cell phone connects to include the terrain, the antennae's angle, the phone itself, and environmental factors. Hill, 818 F.3d at 296. "As a cell phone user moves from place to place, the cell phone automatically switches to the tower that provides the best reception." State v. Johnson, 797 S.E.2d 557, 562 (W.Va. 2017) (quoting In re Application for an Order for Disclosure of Telecomms. Recs., 405 F. Supp. 2d 435, 436-37 (S.D.N.Y. 2005))

Numerous federal courts have acknowledged the general reliability of cell-tower analysis. See e.g., Hill, 818 F.3d at 297 ("District courts that have been called upon to decide whether to admit historical cell-site analysis have almost universally done so."). State appellate courts have also found cell-tower analysis to be generally reliable. See generally State v. Boothby, 951 N.W.2d 859, 871-76 (Iowa 2020) (surveying treatment of historical cell-site data by other jurisdictions); see also Commonwealth v. Nevels, 203 A.3d 229, 241 (Pa. Super. Ct. 2019) (concluding "there exists no legitimate dispute regarding the reliability of historical cell-site analysis"), aff'd, 235 A.3d 1101 (Pa. 2020);

30

Pullin v. State, 534 S.E.2d 69, 71 (Ga. 2000) (affirming the trial court's conclusion that "the geographic location of the cell calls in question is based on sound scientific theory and that analysis of the data can produce reliable results").

Special Agent Hauger did not perform a drive test to confirm the specific coverage areas of the nearby cell towers. In Holbrook, the testifying FBI agent also did not perform a drive test. 525 S.W.3d at 80. The agent testified that Holbrook's cell phone was within the general coverage area of the scene of the crime when the murder was committed. Id. at 81. The expert acknowledged "that while a drive test is the best way to refine the coverage area, the general principles of coverage apply regardless." Id. at 80. Noting that the expert's "testimony expressly identified limitations in the scientific techniques he employed[,]" the Kentucky Supreme Court affirmed the admission of the evidence regarding the general locations of the callers. Id. at 82. We reach the same conclusion here. "[W]hile the absence of a drive test may limit the degree of precision with which an expert may testify about cell phone locations, providing grounds for cross-examination, that absence does not negate the admissibility of such testimony." United States v. Nelson, 533 F.Supp. 3d 779, 794 (N.D. Cal. 2021). Defendant relies on an unpublished opinion that he

contends reached a contrary result. The facts in that case are distinguishable. Moreover, unpublished opinions do not constitute precedent, are not binding, and shall not be cited by any court. R. 1:36-3.

In Hill, the defendant challenged the reliability of historical cell site analysis based on the variables involved, arguing they rendered the methodology too unreliable to be admissible. 818 F.3d at 296. The court found that "[h]istorical cell-site analysis can show with sufficient reliability that a phone was in a general area, especially in a well-populated one. It shows the cell sites with which the person's cell phone connected, and the science is well understood." Id. at 298 (citing United States v. Evans, 892 F. Supp. 2d 949, 956 (N.D. Ill. 2012)).

Despite the variables affecting cell sites, the court determined that exclusion of the evidence was not the correct remedy. Ibid. Instead, any limitations of the methodology should be presented to the jury for the jury to determine the weight of the resulting evidence. Id. 298-99; see also United States v. Jones, 918 F.Supp. 2d 1, 5 (D.D.C. 2013) (stating that "numerous other courts" have concluded that "the mere existence of factors affecting cell signal strength that the expert may not have taken into account goes to the weight of

the expert's testimony and is properly the subject of cross-examination, but does not render the fundamental methodology of cell site analysis unreliable").

Special Agent Hauger candidly explained the limitations of historical cell data analysis. The jury had the opportunity to consider those limitations and was free to give his opinions "whatever weight it deemed appropriate." Harvey, 151 N.J. at 200.

Having carefully reviewed the record in light of the applicable precedents, we find that the methodology used by the State's expert is "generally accepted as reliable within the relevant scientific community." Cassidy, 235 N.J. at 491-92. We discern no abuse of discretion, let alone plain error. The trial court properly found that cell-site analysis is a sufficiently reliable method to determine the approximate location of a cell phone at the time the incident occurred.

V.

Finally, we address defendant's argument that the trial court misapplied the Yarbough factors in imposing the consecutive prison terms and violated his Fifth Amendment right to counsel by considering his failure to personally express remorse as an aggravating factor.

A-3299-18

Appellate courts review sentencing determinations deferentially. State v. Fuentes, 217 N.J. 57, 70 (2014). "The reviewing court must not substitute its judgment for that of the sentencing court." Ibid. (citing State v. O'Donnell, 117 N.J. 210, 215 (1989)). We affirm a sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience." State v. Roth, 95 N.J. 334, 364-65 (1984).

To facilitate appellate review, the sentencing court must "state reasons for imposing such sentence including . . . the factual basis supporting a finding of particular aggravating or mitigating factors affecting sentence[.]" R. 3:21-4(h); Fuentes, 217 N.J. at 73; see also N.J.S.A. 2C:43-2(e) (requiring a sentencing court to provide the "factual basis supporting its findings of particular aggravating or mitigating factors affecting sentence.").

Additional review is undertaken when consecutive terms are imposed. In Yarbough, the Court adopted the following factors for trial courts to consider when determining if prison terms should run concurrently or consecutively:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;

(2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;

(3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:

> (a) the crimes and their objectives were predominantly independent of each other;

> (b) the crimes involved separate acts of violence or threats of violence;

> (c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

> (d) any of the crimes involved multiple victims;

> (e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense; and

(6) there should be an overall outer limit on the cumulation of consecutive sentences for multiple offenses not to exceed the sum of the longest terms

A-3299-18

> (including an extended term, if eligible) that could be imposed for the two most serious offenses.
>
> [100 N.J. at 643-44.]

The Legislature subsequently amended N.J.S.A. 2C:44-5(a) to clarify that "[t]here shall be no overall outer limit on the cumulation of consecutive sentences for multiple offenses." L. 1993, c. 233, § 1.

"[T]he reasons for imposing a consecutive or concurrent sentence should be separately stated in the sentencing decision." State v. Miller, 205 N.J. 109, 129 (2011) (quoting Yarbough, 100 N.J. at 643). "An explicit statement, explaining the fairness of the sentence imposed on a defendant for multiple offenses in a single proceeding . . . is essential to a proper Yarbough sentencing assessment." State v. Torres, 246 N.J. 246, 268 (2021); see also State v. Chavarria, 464 N.J. Super. 1, 19 (App. Div. 2020) (explaining that a sentencing court "must 'articulate [its] reasons' for imposing consecutive sentences 'with specific reference to the Yarbough factors.'"). "When a sentencing court properly evaluates the Yarbough factors in light of the record, the court's decision will not normally be disturbed on appeal." Miller, 205 N.J. at 129.

The court must also "be mindful of the real-time consequences of NERA and the role that it customarily plays in the fashioning of an appropriate sentence." State v. Marinez, 370 N.J. Super. 49, 58 (App. Div. 2004). A

reviewing court will "consider the judge's evaluation of the aggravating and mitigating factors in that light." Id. at 58. Lengthy consecutive terms may be manifestly excessive. See State v. Louis, 117 N.J. 250, 254-58 (1989) (aggregate term of 130 years with a 65-year parole disqualifier found excessive); State v. Candelaria, 311 N.J. Super. 437, 454 (App. Div. 1998) (finding six consecutive terms totaling 105 years plus a life sentence excessive). Here, the judge imposed three consecutive NERA terms, followed by a consecutive ten-year term, subject to a five-year period of parole ineligibility, yielding an aggregate 190-year term, that requires defendant to serve 158 years before being eligible for parole.

The trial court noted defendant's failure to express remorse for his role in committing the homicides. The trial court may consider a defendant's lack of remorse during sentencing. See State v. Int. of D.S., 289 N.J. Super 413, 426 (App. Div. 1996) (affirming a judge's decision that considered defendant's lack of remorse); State v. Jackson, 138 N.J. Super 431, 436 (App. Div. 1976) (same). However, "a defendant's refusal to acknowledge guilt following a conviction is generally not a germane factor in the sentencing decision." State v. Marks, 201 N.J. Super. 514, 540 (App. Div. 1985).

The judge made the following findings. Defendant was thirty years old at sentencing. He was single, had four children, and earned a GED while at the Essex County Youth House. Defendant had adjudications of juvenile delinquency for aggravated assault, unlawful possession of a weapon, criminal sexual contact, and served an eighteen-month term at Jamesburg, where he maxed out after incurring a parole violation. Defendant also received a deferred disposition on an obstruction charge.

As an adult, defendant had prior convictions for third-degree eluding and fourth-degree aggravated assault, and eight disorderly persons offenses. Defendant had seven domestic violence restraining orders entered against him.

The judge found that defendant had been involved with the criminal justice system since age fifteen and had "been a total menace to society." He described defendant's actions as "cruel, depraved, and inhumane . . . ." The judge noted that defendant "killed Tiniquah Rouse in front of her five-month-old infant" and the next day "went to Ashley Jones's apartment where [he] kicked in the door and brutalized [Marshall] and [Jones] by shooting them multiple times in front of three young children." Defendant was the father of two of those children.

The judge found defendant "show[ed] absolutely no remorse whatsoever." The judge intended the sentence to "ensure the safety of" other people and prevent defendant from hurting anyone in the future.

The judge engaged in an incomplete analysis of the Yarbough factors. He noted "that there shall be no free crimes in a system in which the punishment shall fit the crime." The judge concluded that the terms for the three murders should run consecutively, finding the murders were "separate acts of violence" that "were committed at two separate locations over the course of two . . . consecutive dates."

As to the certain persons offense, the judge noted the statute "was meant to enhance the penalty for those individuals who have a prior conviction, otherwise this statute would serve absolutely no purpose whatsoever . . . ."

Defendant was sentenced to three consecutive sixty-year NERA terms for the murders and a consecutive ten-year term, subject to a five-year period of parole ineligibility on the certain persons offense pursuant to the Graves Act. Following merger, the aggregate sentence was 190 years with 158 years of parole ineligibility.

The judge did not any expressly consider Yarbough factors: three (a) ("the crimes and their objectives were predominantly independent of each other");

39

three (c) (whether the crimes were committed "so closely in time and place as to indicate a single period of aberrant behavior"); and five ("successive terms for the same offense should not ordinarily be equal to the punishment for the first offense"). In addition, the judge did not expressly consider the real-time consequences of the consecutive NERA and Graves Act terms. These omissions constrain us to vacate the consecutive sentences imposed on counts eight and eleven of Indictment No. 16-07-2123 and count one of Indictment No. 16-07-2129, and remand for resentencing of those counts. See Chavarria, 464 N.J. Super. at 19 (App. Div. 2020) (vacating the consecutive sentences and remanding resentencing due to absence of "findings of the Yarbough factors"); State v. Soto, 385 N.J. Super. 247, 256 (App. Div. 2006) ("Failure to provide reasons for the imposition of a consecutive sentence may compel a remand for resentencing.").

At resentencing, the judge shall provide a fulsome evaluation of each of the Yarbough factors and explain the fairness of the sentence imposed, considering the real-time consequences of the terms imposed.

In sum, we affirm defendant's convictions but vacate and remand for resentencing of counts eight and eleven of Indictment No. 16-07-2123 and count one of Indictment No. 16-07-2129.

Affirmed in part, vacated in part, and remanded in part for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION